**UNITED STATES of America,**
**Appellee,**

**v.**

**Joseph P. PFINGST, Appellant.**

**No. 460, Docket 73–2345.**

United States Court of Appeals,
Second Circuit.

Argued Nov. 16, 1973.

Decided Dec. 17, 1973.

Joseph J. Marcheso, New York City, for appellant.

Joseph W. Ryan, Jr., Asst. U. S. Atty. (Robert A. Morse, U. S. Atty., for the Eastern District of New York, Gavin W. Scotti, Asst. U. S. Atty. and David G. Trager, Sp. Asst. U. S. Atty., on the brief), for appellee.

Before KAUFMAN, Chief Judge, and SMITH and OAKES, Circuit Judges.

IRVING R. KAUFMAN, Chief Judge:

On April 27, 1972, after a trial lasting more than one month before Judge Weinstein and a jury in the Eastern District of New York, Joseph Pfingst, a New York State Supreme Court Justice, was found guilty on three counts of a ten count indictment for knowingly and willfully participating in three fraudulent transfers in contemplation of bankruptcy in violation of 18 U.S.C. § 152. On the subsequent appeal to this Court, Pfingst alleged numerous errors in the proceeding below. His claims ranged from allegations of erroneous rulings by the trial judge to assertions of prosecutorial misconduct, including the failure to reveal a "deal" with the principal government witness, Ramon D'Onofrio, and the deliberate stimulation of publicity by the government both before and during the trial which allegedly created an atmosphere that precluded a fair trial. After a careful review of the record, we found all of these contentions to be meritless and unanimously affirmed the conviction. United States v. Pfingst, 477 F.2d 177 (2d Cir.), cert. denied, 412 U.S. 941, 93 S.Ct. 2779, 37 L. Ed.2d 400 (1973).

On July 3, 1973, Pfingst moved for a new trial pursuant to Fed.R.Crim.P. 33 on allegedly new information which had come to the attention of Pfingst's counsel, Joseph Marcheso, indicating that the government had suppressed evidence of a mutually beneficial arrangement with D'Onofrio. Pfingst also contended, in support of his motion, that the government had knowingly permitted D'Onofrio to commit perjury at the bankruptcy fraud trial when he denied the existence of certain purported elements of this alleged agreement. After a six-day hearing, which included testimony by Joseph Ryan, the Assistant United States Attorney who prosecuted the bankruptcy fraud trial, Robert Morse, the United States Attorney for the Eastern District (now deceased), Judge Edward Neaher, former United States Attorney for the Eastern District, Anthony Lombardino, former Chief of the Criminal Division for the Eastern District, David Brodsky, Assistant United States Attorney for the

Southern District of New York, D'Onofrio, and D'Onofrio's attorney, Steven Duke, Judge Weinstein denied the request for a new trial.[1] Although he concluded that there was a modicum of nondisclosure, Judge Weinstein found even that modest amount was inadvertent, that it did not relate to evidence which was of such high value to the defense that its existence could not reasonably have been overlooked by the government, and that disclosure of this evidence would not have affected the outcome of the trial. Since we must accord substantial weight to the findings of fact below, especially when as here those findings emerge from conflicting testimony, and because we conclude that the district court applied the correct legal standard in evaluating those facts, we affirm.

## I.

In order to understand the various claims of suppression made by Pfingst, an extended discussion of the relationship between D'Onofrio and the government, spanning more than three years from the summer of 1970 to the summer of 1973, is required.

On June 10, 1970, a Grand Jury was empanelled in the Eastern District of New York to conduct an investigation into the bankruptcy of a Suffolk County dairy, the Evans Amityville Dairy, Inc. and its affiliates, which had occurred in April, 1966. D'Onofrio, who had been a large stockholder in the dairy, learned of this and the fact that an FBI agent, Anthony Scuderi, had been investigating him as well. Accordingly, he decided to approach Scuderi. D'Onofrio offered Scuderi some information about criminal activities unrelated to the bankruptcy

matter, and Scuderi referred D'Onofrio to Agent George Binney of the New York office of the FBI.[2]

On July 17, 1970, D'Onofrio met Binney in New York. D'Onofrio expressed a desire to cooperate with the FBI and indicated a hope that, in return, the FBI might help him in the event that his current financial activities should lead to difficulties with the Securities and Exchange Commission. Binney replied that the FBI would make no promises of assistance and would not for any reason countenance illegal activities by D'Onofrio.

On August 31, 1970, D'Onofrio requested a meeting with Lombardino, then Chief of the Criminal Division of the United States Attorney's Office for the Eastern District of New York, to discuss the pending bankruptcy fraud investigation. Three days later, on September 3, the two men met at Lombardino's office, with Agents Scuderi and Binney also in attendance. D'Onofrio stated that he was willing to cooperate in the investigation and queried Lombardino about the possibility of receiving immunity in return. Lombardino flatly refused to grant this quid pro quo but suggested that D'Onofrio would be permitted to plead guilty and his cooperation would be made known to the district court upon sentencing. At no time did D'Onofrio mention his incipient problems with the SEC at this meeting and Lombardino testified at the hearing below that he was unaware of them.[3]

The following day, September 4, D'Onofrio returned to Lombardino's office, accompanied by his attorney, Steven Duke. Duke expressed concern that his client, in recounting the details of the bankruptcy fraud, would be admit-

---

1. Judge Weinstein treated Pfingst's request for a new trial as one brought pursuant to 28 U.S.C. § 2255, as well as Rule 33, Fed. R.Crim.P., because he was uncertain whether Pfingst's claims could properly be considered the product of newly discovered evidence as required by Rule 33. Accordingly, to overcome any bar to a decision on the merits, Judge Weinstein viewed the motion as alternatively grounded.

2. Scuderi was assigned to the Babylon, Long Island office.

3. Binney's report of the July 17, 1970 interview was not transmitted to the Eastern District Office until March 9, 1972, following the trial court's request that Ryan obtain all FBI reports of D'Onofrio interviews.

ting perjury with respect to prior testimony before the New York State Department of Agriculture and Markets and other agencies investigating the bankruptcy, as well as subjecting himself to criminal and civil liability for tax evasion from the unreported bankrupcty fraud income. Duke, therefore, sought assurances from Lombardino that D'Onofrio would not be prosecuted for these bankruptcy fraud related crimes.[4] Lombardino responded that such assurances were possible but made no firm commitment to Duke and D'Onofrio. A few days later, however, after Lombardino had received approval from Judge Neaher, then United States Attorney for the Eastern District, Lombardino telephoned Duke and informed him that the Eastern District would use its best efforts to prevent D'Onofrio's prosecution for these two crimes.

Soon thereafter the bankruptcy fraud investigation was turned over to Ryan, and Lombardino ceased his involvement in the case. Ryan conducted a number of interviews with D'Onofrio in preparation for his forthcoming appearance before the Grand Jury. At one of these, D'Onofrio repeated his concern over a possible perjury prosecution arising out of his false testimony in the prior bankruptcy proceedings, and Ryan assured him that this should not be a matter of concern as long as D'Onofrio testified truthfully before the Grand Jury and at the subsequent trial. On December 20 and 21, 1970, D'Onofrio testified extensively before the Grand Jury and on February 8, 1971, the Grand Jury returned a ten count bankruptcy fraud indictment charging D'Onofrio, Pfingst and James Feeney with various violations of 18 U.S.C. § 152.

Almost immediately after this indictment was handed down, on February 11, 1971, Marcheso wrote to Neaher, the United States Attorney, seeking to expedite pretrial discovery. The letter began,

> Pursuant to our conversation I am making with this letter a formal request for discovery. It is understood that this is done to expedite preparation of the trial and does not in any way prejudice my client's rights to make formal discovery motions.

It continued by requesting various documents including *inter alia*:

> 7. A brief statement indicating if any promises or assurances were made to defendant D'Onofrio which could reasonably give hope to defendant D'Onofrio for lenient treatment as a result of his testimony;

The record does not indicate whether the government responded to request #7 and it was *not* repeated by Marcheso in Pfingst's formal motion for discovery filed May 7, 1971.

During the early spring of 1971, Ryan was informed by an SEC official, who had read about the indictment in the newspaper, that the SEC was investigating D'Onofrio's involvement to certain securities transactions which included D'Onofrio's use of various Swiss bank accounts. Ryan subsequently learned that the SEC believed Pfingst had some connection with the Swiss bank accounts as well. Although these Swiss bank matters did not appear to Ryan to have a significant relationship to the bankruptcy fraud, Ryan thought it important to inquire about the scope of these activities in the event that Pfingst sought to use this information to undermine D'Onofrio's credibility on cross-examination. Ryan also testified at the hearing before Judge Weinstein that he was concerned Pfingst might argue that D'Onofrio had received some promise of immunity from prosecution for securities violations, in return for his testimony against Pfingst, and Ryan therefore

---

4. Duke testified at the hearing that although he requested these assurances from Lombardino, he thought it at most a remote possibility that D'Onofrio would be separately prosecuted for these bankruptcy fraud related crimes. In Duke's words, "it seemed to me that it was against the policy of the Department of Justice to prosecute people separately for what is in essence a single course of conduct."

emphatically told the SEC to continue its investigation. Ryan then spoke to Neaher about the Swiss bank account situation and Neaher communicated with Duke, requesting him to obtain information about the matter from D'Onofrio. Duke responded that such revelation might well entail self-incrimination by D'Onofrio but that he would convey the request to his client.

On July 1, 1971, Ryan met with Duke and D'Onofrio to discuss the entry of a guilty plea by D'Onofrio on the bankruptcy fraud indictment. At the meeting, Ryan queried the two men about whether they believed any promises had been made to D'Onofrio to induce his guilty plea, aside from dismissal of the remaining counts and a favorable sentencing recommendation. Duke then mentioned Lombardino's assurance that D'Onofrio would not be prosecuted for tax evasion flowing from the unreported bankruptcy fraud income.[5] Ryan responded that despite what Lombardino may have said, no one in the Eastern District could guarantee that D'Onofrio would not be prosecuted for tax evasion because the IRS initiated such prosecutions *sua sponte* and could not always be dissuaded from proceeding. Ryan added, however, that it was the policy of the office not to prosecute an individual twice for essentially the same conduct. The three men also discussed D'Onofrio's Swiss bank activities but, according to Ryan, only in sketchy terms since D'Onofrio was reluctant to say more.

On July 22, 1971, D'Onofrio pleaded guilty to one count of bankruptcy fraud before Judge Bartels. At the plea hearing, the court inquired about possible inducements to obtain the guilty plea and D'Onofrio stated that the only promise he had received from the government concerned the dismissal of the remaining counts and a favorable recommendation on sentencing. Pfingst's attorney, Marcheso, was also present at this hearing before Judge Bartels and made the rather extraordinary and unprecedented request that an evidentiary hearing be held to determine whether any additional considerations prompted D'Onofrio's plea. Marcheso's only specific reference was to D'Onofrio's alleged "failure to pay hundreds of thousands and probably more in income taxes from investigations arising out of the Eastern and Southern Districts of New York." Ryan denied that there were any considerations in addition to those explicitly noted by D'Onofrio, and Judge Bartels refused to accede to Marcheso's demand for a further inquiry.

Several weeks after the entry of the plea, there occurred a startling event which sharply altered what heretofore had been government preparation directed solely toward a bankruptcy fraud trial against Pfingst and Feeney. Frederick Fellman, a former Babylon Town Republican leader, confessed to the FBI that he had purportedly accepted a $50,000 bribe from Pfingst in order to secure the nomination for him as the Republican Party's candidate for Justice of the New York State Supreme Court in 1968. Although D'Onofrio had once mentioned the bribery scheme to an FBI agent in January, 1971, a bribery prosecution seemed insupportable until Fellman's confession. Now, however, Ryan thought the bribery case to be strong. Ryan realized, moreover, that the Swiss bank account activities, which had appeared to have no direct relevance to the bankruptcy fraud prosecution, would play a significant part in the bribery case because one of the Swiss accounts was the alleged source of the $50,000 bribe. Accordingly, recalling D'Onofrio's reticence at revealing information about these accounts, Ryan contacted John Keeney, Chief of the Frauds Section of the Department of Justice, to determine what measures might be tak-

---

5. There is no evidence that at this meeting either Duke or D'Onofrio sought confirmation of Lombardino's second assurance that there would not be a perjury prosecution for D'Onofrio's false testimony during the bankruptcy proceedings.

en to assure D'Onofrio's cooperative testimony concerning the Swiss accounts.

On August 18, 1971, Morse, who, through Gavin Scotti of the Department of Justice, had been informed of Keeney's response, wrote a memorandum to Ryan in which Morse indicated that Keeney believed a grant of formal immunity to D'Onofrio would be inappropriate, because of possible complications with the bankruptcy fraud charge to which he had already pleaded guilty. The memorandum continued, though, that Keeney thought D'Onofrio could be informed that

> Grand Jury testimony will not be used for taxation prosecution and this would constitute a preclusion from prosecution for criminal tax violation and a letter would be put into the file. However, he would be responsible for civil penalties, all of which would add up to an informal grant of immunity.[6]

Armed with this authorization to grant D'Onofrio "informal" immunity from tax evasion prosecution which might arise out of his Swiss bank account revelations, Ryan met with Duke and D'Onofrio on August 18. Ryan's advance preparation proved unnecessary, however, for, according to testimony by both Duke and Ryan at the hearing, the subject of tax evasion never was discussed at this meeting. Ryan testified, therefore, that he had no cause to utilize the authorization he had secured. Rather, Ryan and Duke focussed their discussion on the draft of the bribery indictment already drawn by Ryan, in which Ryan had included D'Onofrio as a co-defendant. Duke argued that D'Onofrio was simply too tangential a figure in the bribery scheme to be joined in the indictment. And, he added that the publicity attendant to the announcement of the indictment might make it difficult for D'Onofrio to obtain his Swiss bank account records. Although the meeting closed without any definite conclusions having been reached on the indictment, Ryan called Duke a few days later and informed him that D'Onofrio would not be recommended for indictment.

In late August, following this meeting, D'Onofrio testified before the Grand Jury that was investigating the alleged bribery of Fellman. On September 1, 1971, the Grand Jury returned a bribery indictment naming Pfingst and Fellman as co-defendants. Immediately, thereafter, the government moved for a trial preference in the bribery case and asked that it be held within 60 days; Pfingst successfully objected.

The government now commenced preparation in earnest for both trials. In November, 1971, in response to a pre-trial discovery motion by Pfingst, Ryan was ordered to furnish a statement concerning all government investigations of D'Onofrio. Ryan thereupon requested such information from the SEC and the Internal Revenue Service. The SEC responded with two letters disclosing a total of seven investigations involving D'Onofrio. The letter which Ryan received from the IRS indicated that it had begun an investigation of D'Onofrio in May, 1971 but due to workload pressures and upon learning of the bankruptcy prosecution pending in the Eastern District, it had decided to temporarily suspend further investigation. The three letters were given to Pfingst.

During the period from November, 1971 to March, 1972, both the government and Pfingst pressed D'Onofrio for additional information concerning the Swiss bank accounts. On March 3, 1972, the court ordered D'Onofrio to produce various records in response to a subpoena issued on Pfingst's behalf. D'Onofrio refused and a hearing was set for March 10 to determine if this refusal was justified. At that hearing, D'Onofrio asserted his Fifth Amend-

6. This August 18, 1971 memorandum from Morse to Ryan was not disclosed to Pfingst before either the bankruptcy fraud or the bribery trials. It was released to Pfingst pursuant to a subpoena in connection with the instant motion for a new trial.

ment privilege against self-incrimination, which the court accepted as a bar to further discovery.

On March 10, the same day as the hearing, Judge Weinstein, acceding to Pfingst's specific request, set down the bankruptcy fraud case to proceed to trial before the bribery case, fixing the commencement of the trial for March 24, 1972. With the bankruptcy fraud trial now only two weeks away, Ryan and D'Onofrio met on a number of occasions to review D'Onofrio's testimony. During one such interview, Ryan asked D'Onofrio to state the extent of any promises made to him by the government, and D'Onofrio replied that he had been assured that he would not be prosecuted for income tax evasion on unreported income from the bankruptcy fraud. Ryan, according to his testimony at the hearing,

> immediately picked up the phone, very excited by this statement of [D'Onofrio's], and . . . told . . . Duke: "D'Onofrio's now claiming some kind of informal immunity on income tax matters and you better get this straightened out right now . . . . I'm going to put him on the phone and you better talk to him because there is no such understanding, and you better clear up any misapprehensions.

And, at a subsequent pretrial interview, Ryan again asked D'Onofrio about his understanding with respect to any promises relating to tax evasion, to which D'Onofrio replied that he understood that there were none.

The bankruptcy fraud trial began on March 24, 1972 and, as expected, D'Onofrio was the key government witness. However, with respect to the critical issue—whether the admitted payments to Pfingst by the bankrupt dairy corporations were bona fide legal fees for services rendered or illicit cash distributions to Pfingst as a stockholder— the government submitted documentary evidence corroborating D'Onofrio's testimony that the latter was the case. Moreover, D'Onofrio's credibility was sharply attacked in the course of five days of vigorous cross-examination. Marcheso repeatedly questioned D'Onofrio about his various stock manipulation schemes, the subject of the multiple SEC investigations. D'Onofrio pleaded the Fifth Amendment at least thirty times in response to these inquiries. Little of D'Onofrio's cross-examination was directed to other crimes arising out of the bankruptcy fraud itself. Marcheso asked a mere six questions about the possibility of a perjury indictment resulting from the filing of a false affidavit in the bankruptcy proceedings by D'Onofrio, and asked not a single question about the likelihood of a tax evasion prosecution for unreported bankruptcy fraud income. The net effect of this assault on D'Onofrio's credibility was not without success. As we noted on Pfingst's direct appeal,

> Indeed, on the charges of which Pfingst was acquitted the evidence was limited to D'Onofrio's testimony, while on the charges of which Pfingst was convicted, in contrast, documentary evidence and the testimony of other witnesses corroborated D'Onofrio's version of the events.

United States v. Pfingst, *supra*, 477 F. 2d at 183.

The bankruptcy fraud trial concluded on April 27, 1972. The bribery trial was scheduled to commence one month later. In preparatory discussions for the second trial with D'Onofrio and Duke, Ryan indicated that it might become necessary to confer immunity on D'Onofrio to insure full disclosure of the Swiss bank transactions. Ryan explained that because of the possible materiality of this information, D'Onofrio's invocation of the Fifth Amendment might well lead the court to strike his testimony,[7] a result which the government sought strenuously to avoid. Duke

7. *See* United States v. Cardillo, 316 F.2d 606, 610–613 (2d Cir.), cert. denied, 375 U.S. 822, 84 S.Ct. 60, 11 L.Ed.2d 55 (1963).

responded that D'Onofrio would prefer not to elaborate upon his Swiss bank activities, for personal safety reasons among other considerations. He added that he believed the offer of immunity to be a "breach of faith" by the government, since D'Onofrio had understood that he would not be required to testify in detail about these accounts. Ryan retorted that there was no basis for such an understanding and that D'Onofrio would be granted immunity if events at the upcoming bribery trial so required.[8]

At this pre-bribery trial interview, Duke also questioned Ryan about the possibility of an assurance that D'Onofrio would not be prosecuted for perjury should his bribery trial testimony reveal prior false statements made under oath in the course of SEC investigations. Ryan noted that he was aware of only one such investigation, an SEC proceeding involving the A.K. Electric Corporation. At that time D'Onofrio had given false testimony concerning the sale of some A.K. Electric stock, which had allegedly been used as collateral for the bribe funds. Since Ryan fully expected D'Onofrio to repudiate his former SEC testimony at the bribery trial, therefore, he expressed his belief that, as with the bankruptcy fraud related perjury, the government would not be likely to prosecute. Ryan, however, could not guarantee that no prosecution would be instituted because jurisdiction over such action rested in the United States Attorney's Office for the Southern District of New York rather than in his office.

On May 27, 1972, the bribery trial commenced with Judge Weinstein presiding. D'Onofrio testified, in response to questioning by the government, that Pfingst had instructed D'Onofrio to withdraw all of Pfingst's funds from his Swiss bank accounts, one of which, named "Chipmunk," was wholly owned by Pfingst while a second, "Egypt," was jointly owned by Pfingst and D'Onofrio. Pursuant to these instructions, D'Onofrio stated that he delivered $75,000 to Pfingst.

On cross-examination, D'Onofrio at first refused to answer whether he owned any Swiss accounts other than "Egypt." Under the threat of contempt, D'Onofrio responded that he owned an account under the code name "Gypsy." Marcheso then asked D'Onofrio whether any part of the $75,000 came from this account, since the bank record produced in court disclosed that only $56,000 was withdrawn from "Chipmunk" and "Egypt." D'Onofrio admitted it might have, but said he could not recall. D'Onofrio then repeatedly refused, in the presence of the jury, to consent to an examination of the bank records of "Gypsy," steadfastly invoking his Fifth Amendment privilege against self-incrimination.

Following a hearing outside the presence of the jury, Judge Weinstein ruled that D'Onofrio had waived his Fifth Amendment privilege in testifying about "Gypsy" and held him in contempt for his refusal to sign the authorization necessary to release the bank records under Swiss law. Pursuant to this contempt citation, D'Onofrio spent the remainder of the trial in jail, some twenty-two days, and was fined $10,000. Judge Weinstein, however, declined to strike D'Onofrio's testimony. At the conclusion of the trial, the jury returned a verdict of not guilty.

A few weeks after the close of the bribery trial, on July 18, 1972, Ryan visited David Brodsky, an Assistant United

---

8. At the hearing, Duke testified that he recalled this so-called "breach of faith" discussion to have occurred at a meeting with Ryan in March, 1972 and not at a meeting subsequent to the bankruptcy fraud trial. Although Judge Weinstein does not appear to have made a finding of fact with respect to this point, we consider the conflict to be immaterial. Irrespective of the time when this discussion took place, Ryan's position, which Duke did not dispute, demonstrates that any "understanding" about the extent of Swiss bank account testimony was unilateral in nature—i. e. solely in the minds of D'Onofrio and Duke.

States Attorney in the Southern District, who had been investigating D'Onofrio's possible securities frauds. At this meeting, Ryan and Brodsky discussed the means used by Ryan to gain D'Onofrio's cooperation because Brodsky believed that D'Onofrio's cooperation would be helpful in the securities fraud investigation. Before Ryan left, he agreed to furnish Brodsky with the transcripts of the two Pfingst trials.

The next day, July 19, an informant telephoned Brodsky to advise him that D'Onofrio was planning to leave the United States. Brodsky, anxious to prevent this departure, immediately sought a basis upon which to file a complaint against D'Onofrio. He had a copy of the testimony which D'Onofrio had given before the SEC in a civil action, Matter of Harwyn Industries, Inc. and, after obtaining a copy of the bribery trial transcript from Marchesco (Ryan, according to Brodsky's testimony at the hearing, was "away" at this time) noted that D'Onofrio had testified falsely in *Harwyn*. Brodsky thereupon filed a perjury complaint on July 20, 1972 and an arrest warrant was issued.

Despite Brodsky's prompt efforts, D'Onofrio succeeded in fleeing to Mexico. Upon learning of the complaint, however, D'Onofrio contacted Brodsky and informed him that Duke would speak with Brodsky about the matter. On July 25, 1972, Duke met Brodsky at a Manhattan apartment. During their conversation, Duke told Brodsky that D'Onofrio had received oral assurances from various members of the Eastern District office that D'Onofrio would not be prosecuted for either perjury or tax evasion revealed by his testimony at the Pfingst trial. Brodsky recorded the substance of Duke's claims in a memorandum to be placed in his file as follows:

a. (per Morse, Lombardino and Ryan): full transactional immunity for prior perjury which he disclosed by his *Pfingst* testimony.

b. (per Morse, Lombardino and Ryan): immunity as to income tax evasion for years 1965–1966 for any funds derived from bankruptcy case.

c. (per Morse and Ryan): immunity as to income tax evasion as to matters disclosed in *Pfingst* testimony if such testimony revealed income.[9]

Immediately after this meeting, Brodsky telephoned Ryan to determine the accuracy of Duke's statements. Ryan responded that the only formal promise which D'Onofrio had received was that he would be allowed to plead guilty to one count of bankruptcy fraud and that his cooperation would be made known to the court at the time of sentencing. Ryan added that D'Onofrio had been told that since, as a matter of

9. This memorandum, dated July 25, 1972, was submitted by Pfingst as an exhibit to his motion for a new trial. At the hearing below, Duke testified that while the Brodsky memorandum accurately reflected Duke's "legal position" as represented to Brodsky, Duke "didn't state [to Brodsky] that anybody used those words." In fact, the following colloquy between Marcheso and Duke suggests the rather amorphous basis for Duke's "understanding":

Q. Now, what the Court and everybody else want to know is what was said to you concerning these assurances?

A. Apart from the conversation with Tony Lombardino [September 4, 1970], I cannot recall what the reaction was to what I stated to be my understanding, except to say that when I stated what my understanding was it was never repudiated, to my knowledge.

Furthermore, even this last statement by Duke—that his understanding was never repudiated—is somewhat contradicted by his later testimony during the following exchange with Marcheso:

Q. Did he [Ryan] say anything to you that would indicate that you did not have that assurance [that D'Onofrio would not be prosecuted for income tax evasion revealed by his testimony in the bankruptcy case]?

A. No, I would say would I—whatever he said was calculated to indicate to me that he was—that was something that he did not directly deal with; that he was not making assurances.

policy, the government would not twice prosecute an individual for essentially the same course of conduct, D'Onofrio need not be concerned about a subsequent prosecution for tax evasion for the unreported income arising out of the bankruptcy fraud. Ryan denied that any additional assurances, informal or otherwise, were made to D'Onofrio.[10]

The following day, Brodsky, seeking a more formal confirmation of the inaccuracy of Duke's claims, sent a letter to Morse, with attention to Ryan and copies to Judge Neaher and Lombardino, reiterating Duke's position that D'Onofrio had been granted informal immunity from perjury and tax evasion prosecutions. Brodsky requested that Ryan investigate these assertions and reply in writing as to their veracity.

On July 27, 1972, D'Onofrio terminated his fugitive status and returned from Mexico to his home in St. Petersburg, Florida, where he was arrested and brought to New York. On August 7, 1972, a Grand Jury in the Southern District of New York returned a 32 count indictment charging various violations of the securities laws. D'Onofrio was named in two counts of that indictment.

Ryan, of course, learned of D'Onofrio's arrest and subsequent indictment. Preliminary to drafting a response to Brodsky's letter, Morse and Ryan discussed these events. Ryan expressed his belief that it would be unwise to prosecute D'Onofrio for the perjury revealed by his testimony at the bribery trial, although similar considerations did not apply to prosecutions for the underlying securities law violations,

because as to these there was likely to be independent evidence.

On August 10, 1972, Morse wrote to Whitney North Seymour, Jr., then United States Attorney for the Southern District, explaining the position of the Eastern District concerning future prosecution of D'Onofrio. The letter reflected the view that, both as a matter of policy and fairness, any prosecution of D'Onofrio should be based on evidence independent of his testimony at the Pfingst trials. It read, in pertinent part:

"However, before furnishing these transcripts [of the Pfingst trials], we would inform you that in our view it would be inadvisable to predicate future prosecutorial action against Mr. D'Onofrio on the testimony given by him as a Government witness in the Pfingst trials, and suggest that such prosecutions continue on evidence obtained independently and from other sources.

"This conclusion is based on two factors: First, as a matter of prosecutorial policy we question the wisdom of subsequently using the evidence given by a cooperating Government witness against him, where the testimony is believed by the Government to be truthful. Such action by the Government would serve to inhibit cooperating witnesses from giving full and frank testimony, particularly on cross-examination by defense counsel.

"Second, from the facts and circumstances under which Mr. D'Onofrio cooperated and testified at the Pfingst trials, there is a risk that a court

10. Brodsky embodied the essence of this conversation with Ryan in a memorandum for his file, submitted by Pfingst at the hearing below, in the following cryptic terms:

The deal with D'Onofrio was that he would plead guilty to one count and would not be prosecuted as to income tax evasion for bankruptcy fraud.

Nothing was said about perjury immunity.

Duke said to Ryan that he didn't want D'Onofrio to have transactional immunity —said he would withdraw.

No agreement as [sic] all on informal immunity.

At the hearing, Brodsky confirmed that this memorandum represented the substance of his conversation with Ryan. Morse testified, however, that in a conversation with Brodsky subsequent to July 25, Brodsky admitted that Ryan had never used the term "deal" and that Brodsky's use of that word was a "sloppy" characterization of what Ryan had told him.

might possibly conclude that Mr. D'Onofrio was lead [sic] to believe that any truthful evidence he provided as a cooperating witness would not later be used by the Government to incriminate him. He was encouraged by our office and the Federal Bureau of Investigation to produce evidence and testify fully in order to avoid any prejudice to the Government's case by a plea of his privilege against self-incrimination. Mr. D'Onofrio produced evidence relevant to the Pfingst trials, including Swiss bank records, and testified up to a point on cross-examination where he invoked his privilege against self-incrimination concerning certain business activities.

"This does not mean that Mr. D'Onofrio is immune from further criminal prosecution. No representations were made that Mr. D'Onofrio would be immune from future prosecutorial action by other agencies. We specifically mentioned to him several pending investigations by the Internal Revenue Service and Securities & Exchange Commission, and Mr. D'Onofrio testified that he expected to face such action."

Brodsky testified at the hearing on the motion for a new trial that, as a matter of comity, his office agreed to comply with the wishes of the Eastern District and to proceed against D'Onofrio on the basis of independent evidence alone.

While D'Onofrio was scheduled to plead to the pending indictment on August 21, 1972, he fled the country and became a fugitive for a second time. In his absence, four additional indictments were returned against him in the Southern District of New York, three charging securities laws violations and the fourth containing the perjury charge on which D'Onofrio had originally been arrested.

D'Onofrio was finally recaptured in London on March 15, 1973. In order to obtain his extradition, Brodsky was required to prove the outstanding perjury charge to the satisfaction of a British Magistrate. Brodsky proceeded to do this on the basis of D'Onofrio's testimony at the Pfingst bribery trial. Before the extradition proceedings were completed, D'Onofrio agreed to return voluntarily to the United States. Under the terms of this agreement, he would be permitted to plead guilty to the four Securities Act indictments—the one filed on August 7, 1972 and the three subsequently handed down—with the fifth indictment, based on the perjury charge, to be dismissed. Although D'Onofrio has not as yet been sentenced, he faces a maximum of seventeen years for the crimes to which he has pleaded.

On July 3, 1973, Pfingst made his application before Judge Weinstein for a new trial, the denial of which is now before us. Pfingst claimed that the government had suppressed the full extent of its arrangement with D'Onofrio and alleged the existence of the following six undisclosed elements of that arrangement:

1. an agreement that D'Onofrio would not be indicted or named as a co-conspirator in the bribery case;

2. an agreement that D'Onofrio would not be granted immunity in order to compel full revelation of his Swiss bank activities;

3. an assurance that D'Onofrio would not be prosecuted for income tax evasion based on unreported bankruptcy fraud income;

4. an assurance that D'Onofrio would not be prosecuted for his perjurious testimony in the course of the prior bankruptcy proceedings;

5. an assurance that D'Onofrio would not be prosecuted for perjury as a result of false testimony before the SEC;

6. an assurance that D'Onofrio would not be prosecuted for income tax evasion on the basis of unreported income derived from his stock manipulation transactions.

Pfingst also contended that in two instances the government had failed to

correct false testimony by D'Onofrio at the bankruptcy fraud trial.

After sifting through six days of often conflicting testimony, Judge Weinstein concluded that the government had made no formal promises to D'Onofrio aside from those revealed at his plea hearing on July 22, 1971 before Judge Bartels—i. e. dismissal of the remaining counts in the bankruptcy fraud indictment and a favorable sentencing recommendation. He did find, however, that primarily based on discussions with Lombardino and Neaher, D'Onofrio had received assurances, although indirect and implied in nature, that he would not be prosecuted for tax evasion based on unreported bankruptcy fraud income or perjury committed during prior bankruptcy proceedings. Judge Weinstein found these to be the only assurances which D'Onofrio had been given prior to the bankruptcy fraud trial. Beyond that, he characterized Duke's statements to Brodsky as "his legal contentions and not what in fact was offered as an inducement to D'Onofrio."

Although the district court agreed with Pfingst that the government erred in failing to disclose these two policy based assurances, he explicitly "reject-(ed) the claim that Ryan deliberately mislead [sic] anyone." Moreover, Judge Weinstein did not consider the undisclosed evidence to be of critical importance to Pfingst and concluded that its revelation would not have affected the verdict. Accordingly, finding no merit as well in Pfingst's alternative grounds—the government's failure to correct D'Onofrio's allegedly false testimony at trial—Judge Weinstein denied the motion for a new trial.

## II.

Because the district court's findings of fact played a crucial role in the decision below, we believe it essen-tial at the outset of our discussion to reiterate the narrow scope of our review of such findings. On appeal, we will not disturb findings of fact, determined after a hearing on a motion made pursuant to 28 U.S.C. § 2255 unless those findings are clearly erroneous. Zovluck v. United States, 448 F.2d 339 (2d Cir. 1971), cert. denied, 405 U.S. 1043, 92 S.Ct. 1327, 31 L.Ed.2d 585 (1972).[11] This standard of review is particularly appropriate in this case for an evaluation of the credibility of the witnesses who testified before the district judge was of fundamental importance in the resolution of conflicting testimony. Thus, we find adequate support in the record to sustain Judge Weinstein's finding that the only assurances the government failed to disclose concerned tax evasion and perjury committed by D'Onofrio in the course of the bankruptcy fraud.

Pfingst's claim that, in return for his cooperation, D'Onofrio was neither indicted nor named as a co-conspirator in the bribery case, is no more meritorious now than when we rejected it on direct appeal. *See* United States v. Pfingst, *supra,* 477 F.2d at 192. Although Ryan had originally included D'Onofrio's name in the indictment, his decision to excise it, following the August 18, 1971 meeting with Duke and D'Onofrio, can more reasonably be explained as an act of prosecutorial discretion rather than as a concession demanded by D'Onofrio in return for his cooperation. At that time, D'Onofrio faced as much as a five year prison sentence on the bankruptcy fraud count to which he had already pleaded guilty. Moreover, as we noted in *Pfingst I,* D'Onofrio was at most a peripheral participant in the bribery scheme.

Appellant's contention that the government's arrangement with D'Onofrio included a promise not to grant him immunity in order to compel disclosure of

11. Because appellant initially moved for a new trial under Fed.R.Crim.P. 33, we should add that a similar if not stricter standard applies to appellate review of findings enunciated subsequent to a hearing on a Rule 33 motion. In that instance, findings of fact are to be sustained unless "wholly unsupported by evidence." United States v. Johnson, 327 U.S. 106, 111–112, 66 S.Ct. 464, 90 L.Ed. 562 (1946).

the full scope of his Swiss bank activities is similarly *without merit*. This claim, too, was made and rejected on direct appeal and, if anything, the additional evidence adduced below only strengthens our conclusion that no such arrangement existed. Although Ryan possessed authorization to grant use immunity to D'Onofrio at both trials, in the face of the not insubstantial number of SEC investigations then pending,[12] he was understandably hesitant to do so. There was, moreover, little need for D'Onofrio's Swiss bank account testimony at the bankruptcy fraud trial and, though of greater relevance in the bribery trial, the wisdom of an immunity grant in that case would have been sharply questioned in view of Judge Weinstein's ruling that D'Onofrio had waived his Fifth Amendment privilege.

With respect to Pfingst's allegation that the government assured D'Onofrio that he would not be prosecuted for his perjurious testimony before the SEC, the record discloses the critical question to be when, and not whether, such assurance was given.[13] Judge Weinstein found, and we agree, that the subject of D'Onofrio's perjury before the SEC was not discussed until some time between the bankruptcy fraud and bribery trials. Duke testified that at the time of his discussion with Lombardino, which was the source of the assurance that there would be no prosecution for the bankruptcy fraud related perjury, he did not mention D'Onofrio's difficulties with the SEC. Duke did recall that subsequently he raised the problem of D'Onofrio's perjury before the SEC with Ryan, but he could not remember when this con-versation occurred. Since we believe it more reasonable that the topic would arise in preparation for the bribery trial in which, unlike the bankruptcy fraud trial, the Swiss bank account testimony was expected to and did play a major part, we credit, as did Judge Weinstein, Ryan's recollection that this particular discussion with Duke transpired between the two trials.

Pfingst's final claim of nondisclosure by the prosecutor rejected below relates to an alleged assurance that D'Onofrio would not be prosecuted for tax evasion based on unreported income derived from his stock manipulation ventures. Pfingst relies on the August 18, 1971 memorandum from Morse to Ryan containing Keeney's suggestion that D'Onofrio could be told that he would have "informal immunity" from tax evasion disclosed by his testimony before the Grand Jury investigating the bribery charge. Both Duke and Ryan testified, however, that the question of D'Onofrio's tax evasion was not discussed between the two men at their meeting on August 18, 1971 or indeed, at any time thereafter. Duke reiterated that the original and sole source of his belief in D'Onofrio's "informal immunity" from tax evasion was Lombardino, with whom Duke had never broached the subject of tax evasion for unreported income earned subsequent to the bankruptcy fraud. Accordingly, we conclude that while the August 18, 1971 memorandum represented authorization to confer informal immunity for post-bankruptcy fraud tax evasion on D'Onofrio, such assurance was never communicated to him.[14]

---

12. The SEC had in fact opposed granting D'Onofrio immunity when Ryan requested the Commission's view in the course of applying for immunity authorization from the Department of Justice.

13. Morse's letter to Seymour of August 10, 1972 appears to confirm that at some point during the extended relationship between D'Onofrio and the Eastern District, an assurance was given with respect to SEC perjury disclosed by D'Onofrio's Swiss bank account testimony at the bribery trial.

14. Nor do we believe that the government had an obligation to disclose the August 18, 1971 memorandum to Pfingst in the course of pretrial discovery. Fed.R.Crim.P. 16(b) explicitly protects such intra-office memoranda from discovery, stating in pertinent part:

[with exceptions not relevant], this rule *does not authorize the discovery or inspec-tion* of reports, memoranda, or other internal government documents made by

Having established the parameters of the government's nondisclosure, we must now determine whether, in the context of this case, either for prophylactic reasons or considerations of fairness to the defendant, such nondisclosure requires a new trial. We said in Kyle v. United States, 297 F.2d 507, 514 (2d Cir. 1961),

The reason why the showing of prejudice required to bring down the balance in favor of a new trial will vary from case to case is that the pans contain weights and counterweights other than the interest in a perfect trial. Sometimes only a small showing of prejudice, or none, is demanded because that interest is reinforced by the necessity that "The administration of justice must not only be above reproach, it must also be beyond the suspicion of reproach," People v. Savvides, supra, and by the teaching of experience that mere admonitions are insufficient to prevent repetition of abuse. See Mapp v. Ohio, 367 U.S. 643, 650–653, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961). In other cases, where the conduct of the trial has been less censurable, or not censurable at all, a greater showing of prejudice is demanded, because the interest in obtaining an ideal trial, with the trier of the facts considering all admissible evidence that has ever become available, and nothing else, is not thus supplemented and may be outweighed by the interest in avoiding a retrial unlikely to have a different outcome—an interest especially weighty when, as is normally true on collateral attack, the second trial will come long after the first.

In United States v. Kahn, 472 F.2d 272, 287 (2d Cir.), cert. denied, 411 U.S. 982, 93 S.Ct. 2270, 36 L.Ed.2d 958 (1973) we recently reiterated the governing standard where nondisclosure is the result of prosecutorial misconduct.

If it can be shown that the government deliberately suppressed the evidence, a new trial is warranted if the evidence is merely material or favorable to the defense. [citations omitted]. The same rule applies, even in the absence of intentional suppression, if it appears that the high value of the undisclosed evidence could not have escaped the prosecutor's attention. [citations omitted]. In each of these instances, the materiality of the evidence is measured by the effect of its suppression upon preparation for trial, rather than its predicted effect on the jury's verdict. [citations omitted].

■ Judge Weinstein found that Ryan's failure to disclose the assurances given to D'Onofrio with respect to perjury and tax evasion revealed by his truthful testimony at the bankruptcy fraud trial was not deliberate. Although aware of these assurances, Ryan believed them to be statements of sound prosecutorial policy—to refrain from multiple prosecutions for crimes arising out of essentially a single course of illegal conduct—rather than a quid pro quo for D'Onofrio's cooperation with the government. Convincing evidence of Ryan's mental attitude can be found in his strenuous efforts at one pre-bankruptcy fraud trial interview to disabuse D'Onofrio of his belief that there was some understanding with respect to tax

government agents in connection with the investigation or prosecution of the case
. . . .
We do not find, moreover, that in restricting discovery in this manner, Rule 16(b) contravenes the constitutional command for due process, as interpreted in Brady v. Maryland, 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), to require disclosure, upon request, of evidence which is material and favorable to the defense. In this in-

stance, the balancing of interests inherent in the due process formulation clearly favors the prosecution's need for protecting communications concerning legitimate trial tactics, especially in view of the necessarily speculative nature of such memoranda. Even in the far more liberal realm of civil discovery, memoranda falling in the category of attorney work product receive protection from discovery. See Fed.R.Civ.P. 26(b)(3).

evasion. To Ryan, there was simply no "understanding," and no agreement embodying a cause and effect relationship between D'Onofrio's decision to testify and the government's determination not to prosecute him for the tax evasion and perjury inextricably linked to the bankruptcy fraud to which he had already pleaded guilty. Thus, having made it clear to D'Onofrio that the policy from which he would benefit applied to any defendant, to Pfingst as well as to D'Onofrio, Ryan could reasonably conclude that these assurances could not serve as a motivating influence prompting D'Onofrio's willingness to testify. Accordingly, we do not consider Judge Weinstein's finding of nondeliberateness to be clearly erroneous.

■ Nor do we believe that the existence of these assurances, especially in view of their neutral, policy oriented nature, represented evidence of such "high value" to Pfingst's trial preparation that Ryan could not help but recognize the necessity for disclosure. To be sure, as we noted in *Pfingst I*,[15] D'Onofrio's credibility was a critical issue at the bankruptcy fraud trial. But, unlike those cases in which the unrevealed evidence was crucial to an evaluation of credibility, *see e. g.* Giglio v. United States, 405 U.S. 150, 92 S.Ct. 763, 31 L. Ed.2d 104 (1972) (key government witness would not be indicted for any crime); Napue v. Illinois, 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959) (key prosecution witness promised a favorable sentencing recommendation), the undisclosed assurances in this case were of minimal if any value in view of the ammunition already available to assault D'Onofrio's credibility. In contrast to

*Giglio* and *Napue*, the government had disclosed well prior to trial that D'Onofrio had been allowed to plead guilty to one count of the indictment and had been promised a favorable recommendation on sentencing. In fact, at Pfingst's request D'Onofrio was sentenced prior to the bankruptcy fraud trial and, because of his cooperation, received only a suspended sentence and a fine of $10,000—a sentence, which in the hands of defense counsel as able as Marcheso, could be telling on cross-examination.

In addition to these weapons, with which Marcheso could and did launch a powerful assault on D'Onofrio's credibility, he developed a line of attack which rested quite logically on D'Onofrio's nefarious course of conduct following the bankruptcy fraud escapade. As Marcheso described it in appellant's brief in *Pfingst I*, Brief for Appellant at 20, United States v. Pfingst, *supra*:

> [The defense mounted] an assault on the credibility of D'Onofrio by showing that D'Onofrio had admitted the commission of many crimes; had amassed a fortune in excess of $9 million subsequent to the bankruptcy without paying taxes on it; that D'Onofrio possessed numerous Swiss bank accounts which he refused to discuss; that he was currently engaged in stock manipulations which were the subject of an inquiry by the Securities and Exchange Commission; that he was not indicted for any of these crimes, some of which he admitted during the course of the trial [citations to transcript omitted]; that his testimony against Pfingst was an invention when he shrewdly assessed that

15. We do not consider our broad language in *Pfingst I* [United States v. Pfingst, *supra*, 477 F.2d at 191] that "[f]ailure to reveal evidence of such an understanding would, of course, violate due process and require a new trial" to be determinative of the instant appeal for two reasons. First, as we have indicated, the undisclosed assurances were not the product of an "understanding," not in the nature of a benefit conferred on

D'Onofrio in return for his testimony. Second, because we found no basis for the allegations of nondisclosure raised by appellant in *Pfingst I*, our conclusion about the effect of nondisclosure was not premised on the careful analysis of materiality required when nondisclosure is in fact revealed. United States v. Mayersohn, 452 F.2d 521, 526 (2d Cir. 1971).

he could extricate himself from difficulties by "selling" to the Government the head of a Supreme Court Judge. Moreover, it is unlikely in the extreme that Marcheso would have utilized the assurances relating to crimes arising out of the bankruptcy fraud because their repetition would only serve to emphasize the very scheme for which his client was on trial. And, it is equally doubtful that Marcheso could have plausibly argued that D'Onofrio was motivated to admit bankruptcy fraud by a desire to avoid prosecution for crimes which, but for his testimony, could not have been proven. Accordingly, we do not consider the undisclosed evidence to be of such "high value" that a new trial is required to remove the taint of prosecutorial impropriety.[16]

■ Although we find no evidence of bad faith on the part of the government, we recognize that "the suppression by the prosecution of evidence favorable to the accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." Brady v. Maryland, 373 U.S. 83, 87, 83 S.Ct. 1194, 1196, 10 L.Ed.2d 215 (1963). In this case, Marcheso requested disclosure of any "promises or assurances made to defendant D'Onofrio which could reasonably give hope to defendant D'Onofrio for lenient treatment as a result of his testimony." While we conclude that the government in good faith interpreted this request as one calling for "assurances" given as a quid pro quo to induce D'Onofrio's testimony and, therefore, not applicable to the assurances at issue, we cannot characterize the government's failure to disclose these policy statements as entirely without fault. Nevertheless, the mere

existence of undisclosed evidence, even following a request, does not alone compel a new trial under Brady for, as we said in United States v. Keogh, 391 F.2d 138, 147 (2d Cir. 1968),

. . . Brady eliminated the issue of good faith when a suitable request has been made, the Court retained the requirement of materiality, as had earlier decisions of ours, see United States v. Consolidated Laundries Corp., 291 F. 2d 563, 570–571 (2 Cir. 1961); Kyle v. United States, 297 F.2d 507, 513–515 (2 Cir. 1961), without, however, being obliged by the facts to define with precision just what this meant.

The term "materiality" as used in Brady clearly describes evidence of greater value than that which is merely "favorable to the accused." Giglio v. United States, supra, 405 U.S. at 154, 92 S.Ct. 763. This distinction, moreover, comports with the rationale that where the prosecutor has at most been negligent in failing to comply with a request for discovery, prophylactic considerations must be tempered by an evaluation of the prejudice to the defendant from the nondisclosure. In striking this balance, where nondisclosure has been inadvertent rather than willful, we have formulated a standard of materiality which requires that there be "a significant chance that this added item, developed by skilled counsel as it would have been, could have induced a reasonable doubt in the minds of enough jurors to avoid a conviction." United States v. Miller, 411 F.2d 825, 832 (2d Cir. 1969); United States v. Mayersohn, supra, 452 F.2d at 526, United States v. Kahn, supra, 472 F.2d at 287.

■ After a careful consideration of the bankruptcy fraud trial record, we

16. Appellant contends that the government's nondisclosure seriously impaired his preparation for trial by depriving him of important facts necessary to make the critical choice —which case to try first. Yet, in light of the overwhelming strength of the evidence already in defendant's possession with which to attack D'Onofrio's credibility, we cannot agree that knowledge of the two undisclosed assurances could reasonably have affected trial strategy. Rather, we believe, and appellant concedes, that it was the unforeseen ruling by the trial judge—refusing to restrict the scope of cross-examination should Pfingst choose to testify—a ruling that Pfingst strenuously though unsuccessfully attacked on direct appeal, that undermined his tactical choice.

are convinced, as was the district court, that revelation of these undisclosed assurances could not have affected the verdict in this case. We have already described the blistering cross-examination to which D'Onofrio was subjected and the devastating revelations extracted to impeach his credibility. The result was that the jury convicted Pfingst only on those three counts for which the government presented independent documentary and testimonial evidence to buttress D'Onofrio's account. Moreover, unlike *Miller*, in which we felt constrained to order a new trial because "the defense could and very likely would have made [the undisclosed evidence] the capstone of its attack on the crucial witness for the prosecution," United States v. Miller, *supra*, 411 F.2d at 832, we cannot conceive, for reasons previously discussed, of a comparable use for the undisclosed assurances here.[17] Accordingly, we conclude that the government's inadvertent failure to disclose that assurances had been given to D'Onofrio that he would not be prosecuted for perjury or tax evasion arising out of the bankruptcy fraud scheme did not so prejudice Pfingst as to require a new trial.

### III.

Pfingst also contends that he was denied a fair trial because at one point the government solicited false testimony during the redirect examination of D'Onofrio and, on a second occasion, failed to correct a false response by D'Onofrio in the course of Marcheso's cross-examination. Appellant therefore urges us to order a new trial on the grounds that whether false evidence is deliberately solicited or allowed to go uncorrected when it appears, either course in "incompatible with rudimentary demands of justice." Giglio v. United States, *supra*, 405 U.S. at 153, 92 S.Ct. at 766. *See also* Napue v. Illinois, *supra*, 360 U.S. at 269, 79 S.Ct. 1173; Mooney v. Holohan, 294 U.S. 103, 112, 55 S.Ct. 340, 79 L.Ed. 791 (1935).

■ Upon examination of the record, however, we find no support for Pfingst's first allegation that the government elicited false testimony from D'Onofrio. The allegedly tainted portion of D'Onofrio's redirect examination occurred after Ryan had read to the jury the three letters, two of which were sent by the SEC and the third by the IRS, which indicated the status of agency investigations of D'Onofrio. After reading the letters, the following colloquy between Ryan and D'Onofrio took place:

Q. All right, has anyone made any promises to you in connection with any one of those investigations?

A. No.

Although Pfingst does not claim that any promises were made to D'Onofrio concerning the pending SEC investigations, he does argue that D'Onofrio was assured that he would not be prosecuted for income tax evasion for unreported bankruptcy fraud income and that the IRS letter read to the jury referred to an investigation into tax evasion related to that source of unreported income. Yet, the letter in question seems clearly to indicate that the IRS investigation was not prompted by the bankruptcy fraud be-

17. Pfingst argues that since a critical question at trial was whether D'Onofrio had perjured himself in his prior testimony during the bankruptcy proceedings or was committing perjury by falsely recanting that testimony at the trial, knowledge that D'Onofrio would not be prosecuted for admitting the prior perjury would have had an important bearing on the jury's resolution of this issue. Though the argument has superficial appeal, its weakness becomes apparent upon consideration of the enormous risk to Pfingst in raising this point to the jury. Emphasizing that D'Onofrio could reasonably expect not to be prosecuted for prior perjury would have had the inevitable tendency of reinforcing the existence of that prior perjury in the minds of the jury. This danger, moreover, was clearly recognized by Marcheso since, except for a brief allusion to the false poverty affidavit filed by D'Onofrio in 1969, he failed even to insinuate that D'Onofrio might not be indicted for the perjury he was then revealing, although he knew full well that D'Onofrio had not been indicted for perjury.

cause the IRS was unaware of the bankruptcy matter until *after* it had begun its investigation. Thus, the letter states, in pertinent part:

> On May 26, 1971 the Intelligence Division of the Internal Revenue Service, Brooklyn District, initiated a preliminary investigation of possible criminal violations of the Internal Revenue Code by Ramon D'Onofrio. Early in the investigation, Special Agent Leo Libowitz, who is assigned to the case, discovered from the files of this office and from news reports that Mr. D'Onofrio was involved in a bankruptcy matter which is of current interest to your office. Because of this, and the press of other assignments, Special Agent Libowitz temporarily suspended his investigation.

Since the investigation referred to in the letter apparently stemmed from D'Onofrio's post-bankruptcy fraud activities, which included the failure to file tax returns for 1969 and 1970, and about which we have already concluded that no assurances were communicated to D'Onofrio, we do not find D'Onofrio's response to Ryan's question to be false.

▇▇▇ Pfingst's second claim of allegedly false testimony by D'Onofrio rests on the following exchange between Marcheso and D'Onofrio, during D'Onofrio's cross-examination:

Q. Mr. D'Onofrio, I believe you testified that you told—withdrawn.

Did you tell the Government that Defendant's Exhibit K, the affidavit, was false?

A. Yes, I did.

Q. Thank you.

Did they tell you that is violation of federal law?

A. They—I don't think they told me it was a violation.

Q. Did you know you could be indicted for that?

A. I know that making a false oath or false statement in front of the bankruptcy court and all the crimes that I committed in relation to this case were capable of being indicted for.

Q. Separate and apart from the bankruptcy transaction in 1965 and 1966, the filing of the false affidavit in 1969 put you in jeopardy of another indictment?

A. If you say so, Mr. Marcheso.

Q. You have never been indicted for this, have you?

A. No.

Q. The Government never indicated that they would indict you for this?

A. They never indicated that they would not.

Although we agree with Pfingst that D'Onofrio's final response was false in light of the assurances he had received concerning bankruptcy fraud related perjury, we do not believe, for reasons similar to those stated in Part II, that this isolated and immaterial instance of false testimony requires a new trial.

Ryan's failure to correct D'Onofrio's false statement could hardly be characterized as deliberate. During five days of cross-examination, the six questions quoted above represented the sum total of Marcheso's inquiry into possible perjury committed by D'Onofrio in the course of the bankruptcy fraud scheme. Thus, we consider Ryan's error in failing to correct the false testimony to be a product of inattention and not of deliberation.

A finding of negligence of course does not eliminate the injustice which will often arise when false testimony stands uncorrected. Nevertheless, in *Giglio* the Court reiterated that, in the absence of bad faith, "a finding of materiality of the evidence is required under *Brady*. . . ." *Giglio v. United States, supra,* 405 U.S. at 154, 92 S.Ct. at 766. And, the Court added that "a new trial is required if 'the false testimony could . . . in any reasonable likelihood have affected the judgment of the jury. . . .' *Napue, supra* at 271 [of 360 U.S., 55 S.Ct. 340]." *Id.* In contrast to both *Giglio* and *Napue,* in which prose-

cution witnesses falsely denied promises of leniency constituting the sole meaningful basis for attacking their credibility, D'Onofrio's false denial nullified no more than a cumulative source of an already demolishing impeachment. Thus, while the materiality threshold embodied in the "in any reasonable likelihood" standard may be low, it represents an insurmountable barrier in this case.

We have considered all[18] of appellant's claims and find them to be without merit. As on direct appeal, appellant's contentions have in many cases a "verisimilitude" but, after a careful and thorough analysis of the record, we believe that the interests of justice do not require a new trial. Accordingly, we affirm.

18. In addition to the two points discussed in the text, Pfingst alleges that the government's failure to disclose D'Onofrio's exaggerated claims of immunity made to Brodsky between late July and early September, 1972, at the time that Pfingst's direct appeal was pending in this Court, amounted to deliberate misconduct, albeit on appeal, which warrants the prophylactic response of a new trial. Suffice to say that having concluded that the government acted in good faith when it failed to disclose the two assurances that were given to D'Onofrio on the ground that they were not considered to be the product of an "understanding," we decline to characterize a similar state of mind on direct appeal as tantamount to bad faith. Accordingly, since we have found that the nondisclosure did not in fact prejudice Pfingst at trial, we see no merit in this claim.