**Robert Wayne GRANT, Appellant,**

v.

**Noah L. ALLDREDGE, Warden, Appellee.**

**No. 838, Docket 73-2536.**

United States Court of Appeals, Second Circuit.

Argued April 29, 1974.

Decided June 10, 1974.

Hubert J. Santos, Asst. Federal Public Defender, Hartford, Conn., for appellant.

Albert S. Dabrowski, Asst. U. S. Atty., Stewart H. Jones, U. S. Atty., for appellee.

Before WATERMAN, FRIENDLY and MULLIGAN, Circuit Judges.

**WATERMAN, Circuit Judge:**

This is an appeal from the denial of motions pursuant to 28 U.S.C. § 2255 and Rule 33 of the Federal Rules of Criminal Procedure, in which the petitioner Robert Wayne Grant sought the vacation of his judgment of conviction and the grant of a new trial. For the reasons developed below, we believe that the motions should have been granted. Accordingly, we reverse the district court's denial of the motions and order that the judgment of conviction be vacated and a new trial be granted.

Petitioner-appellant Grant was one of five persons originally jointly indicted for the September 8, 1970 armed robbery of the East Hartford branch of the Glastonbury Bank and Trust Company. Subsequently this initial indictment was dismissed and, on December 14, 1970, only the petitioner was reindicted. In a one-count indictment he was charged with being an armed man who single-handedly had entered and robbed the bank. In the jury trial which followed Grant was found guilty and received a sentence of fifteen years in prison. The judgment of conviction was summarily affirmed upon appeal.

From our vantage point the Government's case against petitioner at trial does not appear to have been overwhelming. There were two principal offerings upon which the Government attempted to substantiate its theory that Grant was the lone gunman who had robbed the bank. First of all, it was shown that immediately after the robbery Grant and four associates, one of whom was an Anthony Greenhalgh, to whom we shall return shortly, were in possession of a large sum of money under circumstances which might be characterized as suspicious. Secondly, the Government offered the testimony of three bank employees who had been eyewitnesses to the commission of the crime. Of the three, however, only one, bank teller Karen Hull, was able to make a positive identification of Grant as the perpetrator.

Grant maintained at trial, as he continues to maintain now, that he was not the armed man who had robbed the bank. In support of this position, Grant's attorney emphasized the gross discrepancies between Grant's physical characteristics and those of the armed robber, as the latter's composite features were developed through the testimony of the eyewitnesses and the pictures taken by the bank camera while the robbery was in progress. The robber was a large man, standing six feet to six feet two inches in height, weighing over 200 pounds, and having a "muscular back." He held his pistol in his left hand throughout the course of the holdup and would therefore appear to be left-handed. Grant does not fit this description of the robber. Grant is somewhat shorter, much lighter in weight, and less muscular than the man who was described as the robber of the bank. Moreover, Grant is right-handed. Although Grant's attorney argued to the jury that Grant could not conceivably have been the man described by the witnesses, he did not go so far as to suggest who, if not Grant, the armed robber might have been.

Despite the Government's argument to the jury that Grant was the armed robber, this ultimate trial position did not apparently reflect the prosecution's ini-

tial theory of the case. Before trial the Assistant United States Attorney in charge of the case had offered Grant immunity from prosecution if he would cooperate with the Government by testifying that Anthony Greenhalgh, one of the four people with whom Grant had been arrested, was in fact the armed robber. The Government's apparent belief that it was Greenhalgh, and not Grant, who had committed the crime charged in the indictment rested on more than idle speculation, for in every obvious respect Greenhalgh matched the physical description of the robber. Grant refused the offer of immunity in exchange for implicating Greenhalgh, went to trial, and was convicted.

Startled by the jury's verdict, a distraught Grant immediately arranged to speak to agents of the Federal Bureau of Investigation. The agents filed a report of the ensuing interview and, according to the report, Grant, who did not sign a formal statement, gave a comprehensive explanation of the events surrounding the robbery of the bank. Significantly, Grant confirmed the suspicions of others that Greenhalgh, and not he, had been the lone armed man who had been inside the bank. In his statement, Grant admitted being with Greenhalgh immediately before the robbery and driving him away from the bank afterwards. Except for this isolated moment of candor, however, Grant has steadfastly refused to give accusatory testimony against Greenhalgh. Indeed, at the § 2255 hearing before Judge Clarie, Grant resisted the efforts of his present attorney, Federal Public Defender Santos, to persuade him to name Greenhalgh, although Santos there freely pursued the "Greenhalgh theory," and has continued to do so in his brief and oral argument before us. Presumably, then, Grant does not now object to his attorney's use of the "Greenhalgh theory" but instead prefers that that thesis be established by means other than by his own direct incriminating testimony.

On this appeal, Grant raises three grounds which he maintains require that his conviction be vacated and that he be granted a new trial. In brief, his first claim is that, after he requested it, the Government failed to provide him with exculpatory information which, under the doctrine of Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), it was required to produce and to provide to him. His second "claim" is that Anthony Greenhalgh, and not he, was the armed bank robber. And he asserts as a final argument that his privately retained trial attorney was laboring under a pernicious conflict of interest which deprived him of his right to effective assistance of counsel. We have already related some of the reasons for believing that it could well have been Greenhalgh, rather than Grant, who was in the bank.[1] There are other indications which support this view.[2] Despite this, the defense that Greenhalgh could have been the perpetrator of the crime was not raised at Grant's trial. Of course the claim that his trial attorney had a conflict of interest is an attempt to explain why the defense did not rely upon the "Greenhalgh theory" at trial.[3] A decision favorable to Grant on this

1. It is also appropriate to mention that we are not the only ones who are dubious about Grant's guilt. The federal prosecutor who handled the trial in this case, Mr. F. Mac Buckley, is now of the opinion that Grant was not the armed man who entered the Glastonbury Bank and Trust Company when that bank was robbed.

2. For instance, at the hearing below, Greenhalgh invoked the fifth amendment in refusing to answer several questions, one of which was an inquiry as to whether he, Greenhalgh, was the person depicted in the

photographs taken by the camera located in the bank.

3. The conflict of interest under which Grant claims his trial counsel was laboring emanated from that attorney's representation of Greenhalgh in a matter unconnected with the robbery involved in this case. Involved in an examination of the question are a number of interesting issues of fact and law, including whether the attorney represented Grant and Greenhalgh contemporaneously and whether the attorney's representation of Greenhalgh's girlfriend at Greenhalgh's be-

second point would require us first to decide in his favor on the third. However, the merit which we discover in Grant's first claim, his argument based upon the teaching in Brady v. Maryland, *supra*, obviates the need to reach the argument based upon the claim of the ineffective assistance of counsel.

We hold that the Government's failure upon pretrial request fully to disclose information which could have led trial counsel to uncover additional exculpatory evidence so pertinent that its presentation at trial might have induced a reasonable doubt of defendant's guilt in the minds of the jurors constituted a violation of the rule of Brady v. Maryland, *supra*. This governmental omission requires that we vacate the judgment of conviction and order that a new trial be granted.[4]

The *Brady* claim, which more accurately involves two separate but related claims, concerns the possible connection of one John Patrick Walsh with the robbery of the East Hartford branch of the Glastonbury Park and Trust Company. One of the eyewitnesses to the crime, bank manager Harold Field, alerted the local East Hartford police that after the robber left the bank Field had observed a "dark blue car possibly a 1965 Chevrolet, last three numbers are 121, letters unknown," leaving the area. A local police officer was ordered "to look over '[the] area for a beat up Chevrolet car, dark blue color, letters of registration was not gotten but the numbers were 121 Connecticut as the person that held up the bank was seen driving out of the bank yard in this car.'" The FBI was also involved in the search for the supposed robber's car. FBI agents Stiles and Santacroce, together with Police Detective Flaherty, asked two local police officers whether they were familiar with a "Joseph Walsh." One of the lo-

cal officers replied that he was, and this officer was then told that a blue 1965 Oldsmobile, possessing only one license plate, was parked in the wrong direction in front of a house on a nearby street. Proceeding to investigate, the officers discovered it. It was of 1965 vintage and its license number was HV–1214. The officer then rang the doorbell of the house. Although this investigation was being conducted in the middle of the day, the owner of the vehicle, John Patrick Walsh, was found at home there. When questioned by the officers he admitted that the automobile was his, but he became decidedly belligerent when the officers were presumptuous enough to ask him where he was employed and why he was not at work.

It is conceded by the Government that, although the investigation just described was carried out by the local officers, the FBI agents who were also assigned to investigate the bank robbery were aware of the information developed by the East Hartford police concerning Walsh. But, most significantly, Walsh's connection to the case did not cease with this preliminary investigation. The FBI subsequently displayed a picture of Walsh, who, by the way, had previously been in trouble with the law, to bank teller Barbara Harris. The photograph was presented in a "spread" which included pictures of Grant and nine other men. The bank teller selected Walsh, and not Grant, as the person most closely resembling the bank robber. Incidentally, it is reasonable to believe that the FBI must have known that Walsh's physique approximated the robber's for Walsh's height and weight had been marked on the back of the picture exhibited to the bank teller.

Eight months prior to trial the defense moved for the production of all evidence favorable to the accused. The

---

hest constituted such a representation of Greenhalgh himself as to create a conflict prejudicial to Grant. As shall be noted, we do not reach these questions.

4. Of course, at the new trial Grant can, if he so desires, not only present a defense based

on the improperly withheld Brady material but also may present the "Greenhalgh defense" which was not pursued at his first trial.

Government's response to the request was a revelation that Miss Harris "was not able to pick a photograph of this defendant [Grant] from a spread of fourteen photographs, as the man who robbed the bank." What the Government deliberately, and inexplicably, did not disclose was that Miss Harris had selected Walsh's picture as the photo most resembling the robber. After Miss Harris testified at trial, the FBI file which revealed her selection of Walsh was, in compliance with the Jencks Act, turned over to defense counsel. This file, however, contained none of the other information regarding the significant coincidences uncovered in the investigation of Walsh. The Government asserts that this additional information was not recorded in the file because the investigators were satisfied to "wash out" Walsh as a suspect. Yet no one has satisfactorily explained why such an apparently promising suspect as Walsh was so washed out.

Contained within the *Brady* claim which petitioner raises are two separable issues. First, upon Grant's pretrial request for all evidence favorable to the accused, did the Government's limited response that bank teller Harris was unable to select Grant satisfy the Government's *Brady* obligations? Second, was the United States Government required under *Brady* to disclose the other Walsh information, most of which was contained in the East Hartford Police Department report and, though concededly known to the FBI agents investigating the case, had never been incorporated into any written Government reports because Walsh had been "washed out" as a suspect? We hold that the Government's pretrial failure to transmit to the defense the information, indisputably within its possession, that bank teller Harris had selected Walsh's photograph, constituted a violation of the rule of Brady v. Maryland, *supra*. It is therefore unnecessary to reach the second, and more difficult, facet of the *Brady* claim, and to decide the extent to which under the circumstances of this case the United States Government was responsible under *Brady* for the information contained in the East Hartford Police Department report.

The initial question which we must resolve, of course, is whether the teller's selection of Walsh's photograph constitutes exculpatory information to which the defense was entitled upon request. The primary exposition of constitutional dogma on this issue is the teaching of Brady v. Maryland, *supra* at 87, that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." Of crucial importance is, of course, the meaning of the term "material." The standard by which we measure "materiality" is a variable one, dependent on the degree of the prosecutor's culpability in the non-disclosure. In concluding that a prosecutor who had in his files a certain memorandum arguably useful to the defense "should have" located that document, this court has declared that "negligence of the prosecutor in failing to make evidence available to the defense reduces the standard of materiality needed to require the granting of a new trial below the formulations applicable where no prosecutorial misconduct exists." United States v. Miller, 411 F. 2d 825, 832 (2 Cir. 1969) (Friendly, J.) The test articulated there, and recently reaffirmed in United States v. Pfingst, 490 F.2d 262, 277 (2 Cir. 1973), petition for cert. filed, 42 U.S.L.W. 3451 (U.S. Feb. 4, 1974), is that when the prosecution has been negligent in failing to make constitutionally mandated disclosures a new trial should be granted if "there was a significant chance that this added item, developed by skilled counsel as it would have been, could have induced a reasonable doubt in the minds of enough jurors to avoid a conviction." United States v. Miller, *supra* at 832. Of course, as the prosecutor's culpability increases from unavoidable nondisclosure to negligent nondisclosure to delib-

erate suppression, "prophylactic considerations," United States v. Pfingst, *supra* at 277, designed to deter future prosecutorial misconduct begin to assume ascendant, and eventually paramount, importance.

■ We have not been able to fathom why the Government's response to the defense's pretrial *Brady* motion was phrased as it was. At oral argument, the Assistant United States Attorney, who, incidentally, was not connected with this case at the trial stage, was unable to explain to us the Government's motivation. Petitioner Grant charitably suggests that the omission may have resulted from the fact that three different federal prosecutors handled the case in the pretrial stages. In any event, we think it fair to conclude that, at the very least, the failure to reveal the selection of Walsh's photograph, inasmuch as that disclosure was, as we shall soon see, necessary, should be regarded as so negligent on the Government's part as to reduce the threshold of materiality to that set forth in United States v. Miller, *supra*. Applying that standard, we believe that the pretrial disclosure that the teller had selected Walsh's picture probably would have enabled trial counsel to uncover the Walsh information contained in the East Hartford Police Department report, and thereby would have created "a significant chance that this added item, developed by skilled counsel as it would have been, could have induced a reasonable doubt in the minds of enough jurors to avoid a conviction." *Id.* at 832. It is instructive to note that the phrase "developed by skilled counsel as it would

have been" does not necessarily restrict the scope of our inquiry to show how the "added item" would have been used at the trial itself but would rather seem to be of sufficient latitude to permit us to examine how defense counsel might have utilized his knowledge of the "added item" *in preparation* for the trial.[5]

■ We are confident that the Government should have known, if it did not in fact know, that the disclosure of Miss Harris's selection of the Walsh photograph would have in all likelihood caused Grant's attorney in preparing Grant's case for trial to make further inquiries which would have led to most, if not all, of the information pertaining to Walsh in the local police report. The fact that not only Grant's photo was not selected by Miss Harris but that of another man was might have been significant enough for counsel to investigate further; pictures of those appearing in photographic spreads are often those of people who have had previous contacts with the authorities and perhaps even some suspected connection with the criminal acts under investigation. Presumably, given the time for such an investigation, defense counsel here might have contacted Walsh himself. Also, counsel might have made more specific demands of the federal prosecutors for disclosures concerning Walsh, and the prosecutors may have then made concrete inquiries of the investigating FBI agents who, it seems at that point anyway, might have had a *Brady* responsibility to reply to any particularized defense motion for information concerning Walsh.[6] Although we do not reach the issue of the responsibil-

---

5. In United States v. Polisi, 416 F.2d 573, 577 (2d Cir. 1969) (emphasis inserted), we viewed the significance of Brady, which was not cited in Miller but concerns the identical problem of prosecutorial nondisclosure, as "its holding that the concept out of which the constitutional dimension arises in these cases, is prejudice to the defendant *measured by the effect of the suppression upon defendant's preparation for trial*, rather than its effect upon the jury's verdict."

6. We are assuming here that the federal prosecutors were, in truth, ignorant of any

other Walsh information, and so our text discussion involves some use of hindsight. Nevertheless, the disturbing prosecutorial omission in the Government's initial disclosure of the Harris photograph identifications is, viewed in the most favorable light, at least a negligent omission to furnish favorable evidence and perhaps could be an intentional one. Therefore, we are not reluctant to use hindsight to view the possibilities to which the improperly omitted material could have been used by the defense.

ity of the United States Government for the information contained in the local police report, information concededly known to the FBI agents, that information, at least in retrospect, illustrates precisely why in this case the Government's "half disclosure" of the Harris identification made prior to trial was so grossly unsatisfactory. A full disclosure could have, indeed probably would have, led to defense discovery of all the information involving Walsh. That information, in the aggregate, could then have been used by Grant's attorney to support a theory that it was likely that Walsh had committed the crime. Such a defense, it seems to us, could have "induced a reasonable doubt in the minds of enough jurors to avoid a conviction." United States v. Miller, *supra* at 832. We thus hold that, even assuming that the Government's response was only negligent, and not wilful, the evidence withheld possessed sufficient materiality to require the grant of a new trial.

Here it was imperative that upon request prior to trial the complete details of the Walsh identification by Miss Harris be disclosed. Although it well may be that marginal *Brady* material need not always be disclosed upon request prior to trial, the fact that Miss Harris had selected Walsh as a suspect was without question " 'specific, concrete evidence' of a nature requiring pretrial disclosure to allow for full exploration and exploitation by the defense." United States v. Gleason, 265 F.Supp. 880, 885 (S.D.N.Y. 1967) (Frankel, J.). This information, so withheld by the Government, would have had a " 'material bearing on defense preparation.' " United States v. Eley, 335 F.Supp. 353, 357 (N. D.Ga.1972), quoting United States v. White, 50 F.R.D. 70, 73 (N.D.Ga.1970), aff'd, 450 F.2d 264 (5 Cir. 1971), cert. denied, 405 U.S. 1072, 92 S.Ct. 1523, 31 L.Ed.2d 805 (1972), and therefore

should have been revealed well before the commencement of the trial. The district court thought that "disclosure of [Walsh's] identity would not have materially aided in the preparation of a defense." But, as we have said, the particular disclosure might have led, had it been made well in advance of trial, to the other significant information concerning Walsh. It was the district court's belief, however, that such an assumption is unwarranted for, when the information was eventually revealed at trial, the defense did not, on the ground of surprise, seek a continuance for the purpose of gathering additional material on Walsh. We refuse, however, to infer from the failure of defense counsel, when surprised at trial, to seek time to gather other information on Walsh, that defense counsel would have by-passed the opportunity had the prosecutor apprised him of the Harris selection of Walsh at a time when the defense was in a reasonable pre-trial position to evaluate carefully all the implications of that information.[7] Given the time for preparation which counsel was denied by the belated disclosure, it seems to us counsel might have pursued a course of inquiry which would have resulted in ferreting out the relevant Walsh information. Inasmuch as we find that, at a minimum, the prosecution was negligent in initially withholding the specifics of the Harris identification, the granting of a new trial is by no means contingent on our being absolutely positive that defense counsel would have unearthed the details which pertained to Walsh's possible involvement in this crime for, although "we cannot confidently say," United States v. Miller, *supra* at 832, for certain, that the defense would have discovered the other Walsh information and then used those facts successfully in its argument to the jury, we can and do say that, in view of the serious doubts we

---

7. "[T]here may be instances where disclosures of exculpatory evidence for the first time during trial would be too late to enable the defendant to use it effectively in his own defense, particularly if it were to open the door to witnesses or documents requiring time to be marshalled and presented." United States v. Cobb, 271 F.Supp. 159, 163 (SDNY 1967) (Mansfield, J.).

entertain about whether the right person was convicted here, we adopt the position we took in *Miller, supra* at 832, that "[u]nder all the circumstances, as Judge Swan wrote in United States v. Consolidated Laundries, *supra*, 291 F.2d [563] at 571, 'we are content to rest our decision on our conviction that the denial of a new trial here is inconsistent with the correct administration of criminal justice in the federal courts, which it is our duty as an appellate court to supervise.' "

The judgment of conviction is vacated and a new trial is ordered.