**Lyle S. WOODCOCK,
Petitioner-Appellant,**

v.

**R. W. AMARAL, Respondent-Appellee.**

**No. 74–1140.**

United States Court of Appeals,
First Circuit.

Argued Sept. 11, 1974.

Decided Dec. 26, 1974.*

---

\* As amended March 4, 1975, after consideration of appellant's petition for rehearing.

Daniel F. Featherston, Jr., Boston, Mass., with whom Featherston, Homans, Klubock & Griffin, Boston, Mass., was on brief, for appellant.

Michael C. Donahue, Deputy Asst. Atty. Gen., with whom Robert H. Quinn, Atty. Gen., John J. Irwin, Jr., Asst. Atty. Gen., Chief, Crim. Div., and David A. Mills, Asst. Atty. Gen., Chief, Crim. Appellate Section, were on brief, for appellee.

Before COFFIN, Chief Judge, CAMPBELL, Circuit Judge, and MOORE,** Senior Circuit Judge.

MOORE, Senior Circuit Judge.

This is an appeal from a decision of the United States District Court for the District of Massachusetts dismissing appellant's petition for a writ of habeas corpus. The district court's memorandum and order (reported at 373 F.Supp. 644) was based on an agreed record and the parties' briefs and oral arguments.

The appellant Lyle S. Woodcock was at one time an executive vice president and director of Liberty Loan Corporation, a company in the business of making small loans. In 1964 he was indicted by a Massachusetts special grand jury along with numerous other employees of small loan companies, the companies themselves, and some state officials. The indictment charged conspiracy and bribery of the state officials and resulted in two trials (commonly known as the "small loans cases"). Only the first trial—the so-called "first small loans trial"—is directly at issue in this appeal, although it will be necessary for us to refer occasionally to the "second small loans trial" and the matters at issue therein.

The first small loans trial involved fifteen defendants and a total of forty-eight indictments, three of which named Woodcock. The trial lasted five months and generated a voluminous record, and Woodcock, along with most of his codefendants, was found guilty of conspiracy and bribery.

Appeals from the convictions were deferred until after the second small loans trial, which concerned an unrelated bribery scheme and in which Woodcock received a directed verdict of acquittal. Eventually appeals from the two trials were consolidated and heard by the Supreme Judicial Court of Massachusetts, which affirmed the convictions in one of the longest opinions in that court's history. Commonwealth v. Beneficial Finance Company, 1971 Mass.Adv. Sheets, 1367, 275 N.E.2d 33 (1971). The Supreme Court denied certiorari, 407 U.S. 914, 92 S.Ct. 2433, 32 L.Ed.2d 689, and Woodcock's petition for a writ of habeas corpus followed.

The object of the conspiracy and bribery involved in the first trial was to insure that the Massachusetts Rate Board, which regulated the interest rates on small loans, did not lower the permissible rate. One Martin J. Hanley was the Deputy Commissioner of Banks in

---

** Of the Second Circuit sitting by designation.

Massachusetts and the supervisor of the small loans industry. It was his job to present information pertinent to interest rates to the Rate Board at hearings beginning in November 1962. The agreement to bribe Hanley and through him at least some of the members of the Rate Board was made at a meeting held in October 1962, at the Commodore Hotel in New York City.[1] Woodcock was present along with officials of other small loan companies, including one William Heath, a public relations executive with American Investment Co. Heath was to become the prosecution's star witness at trial, and without his testimony the government concedes that Woodcock could not have been convicted.

At trial, Heath recounted the proceedings at the Commodore Hotel meeting. First there was a discussion concerning whether to have a "program" to bribe the Rate Board and then the size of the sum necessary to effectuate the bribe was considered. One participant, Frank Glynn, estimated that between $50,000 and $75,000 would be required. Woodcock responded that this figure was ridiculously high and that his company would have nothing to do with a program of that size. Heath then opined that $25,000 would probably be adequate, and, according to Heath, Woodcock replied:

"At the $25,000 figure perhaps we have no choice, but I want it clearly understood that the figure is $25,000 and not one penny more, and no one is to come back at a later date and request that the figure be raised under any conditions."

The parties have stipulated that this testimony was crucial to Woodcock's conviction.

Woodcock urges reversal of the district court's dismissal of his petition on several grounds. All of his arguments have been considered by the trial court (either in motions made at various stages during the trial or in the defendants' subsequent motions for a new trial), the Supreme Judicial Court of Massachusetts, and the district court. His contentions will be discussed in the order in which he raises them in his brief.

### I. The *Brady* Issues

■ The first group of arguments raised by the appellant relates to the prosecutor's duty to disclose evidence materially favorable to the accused. See Brady v. Maryland, 373 U.S. 83, 86, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Woodcock cites three instances in which the favorable evidence was not disclosed and one in which the evidence, though disclosed, was allegedly the subject of a prosecutorial misrepresentation which induced Woodcock's attorney to refrain from bringing up the evidence at trial. To prevail under *Brady*, of course, the appellant must show not only that favorable evidence was not disclosed but also that the evidence was material to the issues of guilt or punishment. *E. g.,* Giglio v. United States, 405 U.S. 150, 154, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972).

■ During the first small loans trial, Woodcock's attorney was given portions of Heath's grand jury testimony which showed that at the same Commodore Hotel meeting at which Woodcock allegedly entered into an agreement to bribe the Rate Board, he had also angrily refused to pay Hanley on another matter, the so-called Hanley program, which was the subject of the second small loans trial. However, the prosecutor, Mr. Travers, warned Woodcock's trial counsel that to cross-examine Heath on this refusal might well introduce criminal matters which, although not related to the allegations at issue in the first small loans trial, would nonetheless be prejudicial to Woodcock.[2] Evidence about Woodcock's refusal to participate in the Hanley program would presumably have undercut the testimony that he

---

1. It is stipulated that the meeting was first called for legitimate purposes—to discuss the possible formation of an industry trade association and the preparation of statistics for presentation to the Rate Board.

2. Joint Appendix 520.

agreed to bribe the Rate Board. For the jury to convict him of participating in the Rate Board conspiracy, Woodcock argues, it would have had to believe that he agreed to a bribe at one moment and then shortly thereafter, at the same meeting, emphatically disapproved of another bribe.[3] But having been deterred by the prosecutor's warning and thinking that questioning would bring out incriminating evidence pertaining to the Hanley program (for which the appellant was then under indictment), counsel did not cross-examine Heath about Woodcock's angry refusal to pay. Later, at the second small loans trial, when Heath did in fact finally testify concerning Woodcock's refusal to participate in the Hanley program, no other evidence in any way incriminating to Woodcock was disclosed, and he received a directed verdict of acquittal. Naturally, this development caused Woodcock's lawyer to wish that he had examined Heath about the refusal at the first trial and to think that he had been misled by the prosecutor's warning.

■ The appellant contends that the prosecutor's warning was not made in good faith, but rather was a device to prevent injection of evidence about the Hanley program into the first trial. Such testimony, Woodcock argues, would inevitably have brought to light the involvement of his codefendants in this wholly separate conspiracy, and the resulting prejudicial effect would have prompted them to move for a mistrial. This, of course, the prosecutor wanted to avoid. Were we to accept the contention that the prosecution deliberately undercut the value of a disclosure made pursuant to *Brady* with a false warning, there would be little doubt that a new trial would be required. If nondisclosure of *Brady* material is occasioned by prosecutorial misconduct, prophylactic considerations assume overriding importance. Accordingly, as decisions in other circuits have recognized,[4] a much-reduced showing of materiality is required for a defendant so victimized to obtain a new trial. We have no doubt that this evidence would clear that small hurdle. In this case, however, there is every indication that the warning was made in good faith. At the hearing on the motions for a new trial made by the various defendants, the prosecutor, Mr. Travers, testified extensively. He explained that based on his knowledge of the evidence, he had thought when he gave the warning (and still thought at the time of the hearing) that an inquiry into Woodcock's refusal to contribute to the Hanley program would bring out evidence of still another conspiracy involving bribery of public officials in Massachusetts, the so-called legislative program.[5] After hearing this testimony, the trial court explicitly ruled that the prosecutor had made "a perfectly correct, proper, and truthful statement under all of the circumstances."[6] There is ample evidence to support this ruling, and we are not willing to dispute it at this stage.[7]

---

3. Although we are willing to assume that the appellant would have gained some benefit from this evidence, we note that Woodcock's refusal to participate in the Hanley program is not necessarily inconsistent with his participation in the Rate Board program. Woodcock had shown considerable reluctance to go ahead with the latter scheme and had agreed only after setting a maximum dollar figure. Thus, it is not unusual that he refused when later asked to contribute more money.

4. *E. g.*, Grant v. Alldredge, 498 F.2d 376 (2d Cir. 1974); United States v. Pfingst, 490 F.2d 262 (2d Cir. 1973), cert. denied, 414 U.S. 919, 94 S.Ct. 2625, 41 L.Ed.2d 224 (1974); Evans v. Janing, 489 F.2d 470 (8th Cir. 1973); Ross v. Texas, 474 F.2d 1150 (5th Cir.), cert. de-

nied, 414 U.S. 850, 94 S.Ct. 141, 38 L.Ed.2d 98 (1973); Clarke v. Burke, 440 F.2d 853 (7th Cir. 1971), cert. denied, 404 U.S. 1039, 92 S.Ct. 718, 30 L.Ed.2d 731 (1972); Rhinehart v. Rhay, 440 F.2d 718 (9th Cir.), cert. denied, 404 U.S. 825, 92 S.Ct. 53, 30 L.Ed.2d 53 (1971). This Circuit has hinted at the adoption of a presumption of prejudice in cases involving prosecutorial misbehavior. United States v. Donatelli, 484 F.2d 505, 508 n. 2 (1st Cir. 1973).

5. Joint Appendix 521.

6. *Id.* 235.

7. An examination of Heath's grand jury testimony shows some link between the legislative program and Woodcock's refusal to contrib-

It is unfortunate that defense counsel may have changed his trial tactics based on a warning which ultimately proved to be unwarranted. But there was full opportunity for counsel to explore the meaning of the warning more fully, and absent deliberate prosecutorial misconduct we see no basis for reversal on this ground.

■ The appellant's remaining *Brady* contentions are directed at three alleged failures of the prosecution to make constitutionally mandated disclosures of exculpatory evidence. Woodcock first argues that expense vouchers submitted by Heath to his employer were wrongfully withheld since they would have provided a basis for impeaching Heath's credibility. The circumstances were these. During the first trial Heath testified that "within a week or one or two days" before the crucial meeting at the Commodore Hotel, he had met with James Pratt and Francis Glynn, public relations men for other loan companies, at Purcell's Restaurant in Boston, where the Rate Board program was first discussed.[8] In January, 1964, the prosecution received from the Massachusetts Crime Commission a massive collection of documents relating to the Commission's investigation of the small-loans industry. Among those documents were Heath's expense vouchers covering a four-year period which showed that during the two weeks preceding October 17, 1962, the date of the Commodore Hotel meeting, Heath had recorded lunches with others than Glynn and Pratt on every working day during which he was in Boston. Woodcock contends that, possessed of these vouchers, he would have been able to to show that Heath either lied about when the meeting took place, lied about its having taken place at all, or submitted falsified expense vouchers, thus general-

ly impeaching the credibility of a witness whose testimony was admittedly crucial to his conviction.[9]

Appellant labels the failure to make the vouchers available to the defense before the first trial "deliberate". The Commonwealth concedes that it was "conscious". We have scrutinized the testimony presented at the hearing on the new trial motions of appellant and several of his codefendants. The prosecutor testified that immediately prior to the first trial he and an assistant undertook on a crash basis to review all of Heath's grand jury testimony and related documents in order to furnish to the defendants "anything that reflected in any way on the testimony that Heath was to give . . . ." While he was aware of the existence of the vouchers, the prosecutor testified, he did not intend to make reference to them at trial, and did not consider them pertinent to any evidence that would be offered at trial. The failure to make the vouchers available to the defense was "deliberate" in the sense that it was the result of a conscious decision, rather than inadvertence, but there is nothing in the record from which we would infer that the prosecutor was aware before the first trial that the vouchers might have any value to the defense. It seems entirely credible to us that, at least at that time, that a prosecutor, rejecting the positive worth of the vouchers as evidence to buttress his own case, might overlook their value to defense counsel in demonstrating that a witness, who had testified on another issue against his client, might be impeached on a collateral statement about having lunch within a certain period with certain people.

Educated by events at the trial, and by appellant's arguments—refined in the course of the new trial hearing, an ap-

---

ute to the Hanley program and lends credence to Mr. Travers' explanation for his warning. *See* Joint Appendix 262–65. Moreover, Travers testified that his warning was based on more than merely Heath's grand jury testimony. Joint Appendix 522.

8. Testimony about the meeting at Purcell's was not admitted against Woodcock.

9. Evidence affecting the credibility of an important witness falls within the disclosure obligation of the prosecution. Giglio v. United States, 405 U.S. 150, 154, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972).

peal to the Supreme Judicial Court of Massachusetts, and the present litigation—we can see that the vouchers would have been of some use to appellant at the first trial. We think they should have been furnished to appellant before trial, but we do not think that the failure to do so, in the context we have set forth, when the disclosure by the Commonwealth was deemed by the presiding justice "probably the most full and complete disclosure ever made in a trial of a criminal case in this Court",[10] and when the useful items were but a few of four years' worth of vouchers, requires a new trial. Other courts have adopted a variety of standards for the determination whether the prosecution's failure to disclose exculpatory evidence after a general request from the defense requires a new trial.[11] We conclude that the failure to disclose in this case was an innocent miscalculation of utility of the evidence to the defense. We do not reach the question whether a different standard would apply to a more serious failure to disclose. We simply hold that a new trial is not required in this case because we cannot say that had the evidence been disclosed its use would have created a reasonable possibility of a different result.

It must be borne in mind that Heath's testimony that he lunched with Pratt and Glynn at Purcell's Restaurant shortly before the Commodore Hotel meeting had nothing to do with appellant. The impeachment possibility lay in showing that on nine or ten working days during the two weeks preceding the Commodore Hotel meeting Heath sought reimbursement for lunches with others than Pratt and Glynn. Would this have made a difference? We take into consideration the following factors. Heath's testimony was voluminous, he being the key witness in the whole trial. It is speculative at best that even if proven false in one detail, he would be discredited across the board. This factor takes on strength when we consider the likely response that, since Heath had testified he had orders not to pay for meals of other industry public relations personnel—which Pratt and Glynn were—, the meeting might have taken place in addition to the reported lunches, as Heath occasionally had more than one lunch session in a given day; or that a reported lunch was merely one for which he had paid the bill, as sometimes happened. We also take into consideration the influence of the nondisclosure on appellant's ability to prepare fully for trial. Unlike the

**10.** Quoted by the Supreme Judicial Court, Commonwealth v. Beneficial Finance, *supra*, 1971 Mass.Adv. Sheets at 1481, 275 N.E.2d 33.

**11.** The Second Circuit in a pertinent series of decisions has evolved a variable standard which decreases the level of "materiality" required for a new trial as the culpability of the prosecution in failing to disclose increases. Where the prosecution is simply negligent the test is whether "there · was a significant chance that this added item, developed by skilled counsel as it would have been, could have induced a reasonable doubt in the minds of enough jurors to avoid a conviction." Grant v. Alldredge, 498 F.2d 376, 380 (2d Cir. 1974), *quoting* United States v. Miller, 411 F.2d 825, 832 (2d Cir. 1969). Presumably this standard would also apply to "[f]ailure to appreciate the use to which the defense could place evidence in the prosecution's hands." United States v. Keogh, 391 F.2d 138, 148 (2d Cir. 1968). As the culpability of the prosecutor "increases from unavoidable . . . to negligent nondisclosure to deliberate suppres-

sion, 'prophylactic considerations' " become more compelling and eventually paramount. United States v. Pfingst, 490 F.2d 262, 277 (2d Cir. 1973), cert. denied, 417 U.S. 919, 94 S.Ct. 2625, 41 L.Ed.2d 224 (1974); Grant v. Alldredge, *supra* at 381 of 498 F.2d. *See also* Levin v. Katzenbach, 124 U.S.App.D.C. 158, 363 F.2d 287 (1966); Ross v. Texas, 474 F.2d 1150 (5th Cir. 1973), cert. denied, 414 U.S. 850, 94 S.Ct. 141, 38 L.Ed.2d 98 (1973).

The commentary to the section of the A.B.A. Standards Relating to Discovery and Procedure Before Trial requiring disclosure of exculpatory material notes that the initial determination of what evidence to disclose always rests with the prosecutor and must be made in "light of his sense of justice", and that "it may be expected that generally prosecuting attorneys will become accustomed to disclosing all material which is even possibly exculpatory, as a prophylactic against reversible error and in order to save court time arguing about it." A.B.A. Standards, Discovery and Procedure Before Trial, at 74–75, *approved* 1970.

situation in Grant v. Alldredge, 498 F.2d 376 (2d Cir. 1974), no avenues of possibly fruitful exploration were foreclosed. Appellant lost the opportunity to exploit the lunch schedule reported in the vouchers—but no more.

We cannot know what was on the minds of the jurors, nor can we say how cross-examination of Heath based on the vouchers would have affected them, but the impact of the vouchers upon us is not great, and, as we have no other means by which to estimate what their impact would have been on the jury, we conclude that failure to disclose the vouchers did not sufficiently prejudice appellant to warrant a new trial.

■ The appellant's remaining objections concern the nondisclosure of portions of Heath's grand jury testimony. In his last appearance before the grand jury, in December 1965, Heath did not name Woodcock as being present at the 1962 Commodore Hotel meeting, although in previous testimony Heath had specifically identified Woodcock as a participant. The appellant contends that this apparent inconsistency should have been disclosed. The appropriate answer to this argument, however, was given by the trial court in denying the motions for new trials:

> "Neither the defendants nor this court can expect that on every date and on every page of the transcript . . . the witness will give and repeat the aggregate of all his testimony on any particular issue, event, occurrence, or case." [12]

To require a witness to summarize his prior testimony, with the attendant risk that an omission could be construed as an inconsistency, would create an intolerable burden on judicial proceedings. Heath's omission in his last grand jury

appearance is hardly exculpatory at all, much less material.

■ The final portion of Heath's grand jury testimony which appellant contends was wrongfully not disclosed contains a statement by Heath in which he recounted a 1957 conversation with Woodcock which he regarded as an effort by Woodcock to blackmail him. Although any motive a witness might have to distort the truth may at times be extremely important, cf. Giglio v. United States, 405 U.S. 150, 154–55, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972), in this instance the testimony about the supposed blackmail attempt, and hence the failure to disclose it, appear to have little significance. The appellant would characterize Heath as having "brooded" for seven years about an attempted blackmail but in fact the trial court found that there was much evidence of friendship between Heath and Woodcock. (Appendix 232). Under these circumstances, the unintentional nondisclosure of this evidence cannot be deemed the basis for a new trial.

In summary, we find nothing in Woodcock's *Brady* contentions that requires reversal. Nor do his contentions, which are all without individual merit, gain any strength when viewed collectively.

## II. Sufficiency of the Indictment

■ During his first trial Woodcock was furnished with a transcript of the relevant grand jury testimony against him. One day thereafter [13] he sought to dismiss the indictment on grounds of insufficient evidence. The trial judge dismissed his motions as untimely, and the Supreme Judicial Court of Massachusetts ruled that this action was not an abuse of discretion.[14] Woodcock now maintains that it is a denial of both due process

---

12. Joint Appendix 233.

13. Woodcock's "Motion for Leave to File Motion to Dismiss" and accompanying "Motion to Dismiss" were filed on September 27, 1966. The trial began on August 9, 1966.

14. The Supreme Judicial Court of Massachusetts stated, *inter alia:*

Return of an indictment on insufficient evidence is not an error of constitutional dimension such as to compel a judge to consider an untimely motion.

1971 Mass.Adv. Sheets at 1397, 275 N.E.2d at 58–59.

and equal protection to permit the return of an indictment on insufficient evidence. The district court did not consider whether the evidence was in fact insufficient, since it ruled that the claim was not one of constitutional proportion. 375 F.Supp. at 646.

We agree with the conclusion of the district court. In Costello v. United States, 350 U.S. 359, 76 S.Ct. 406, 100 L.Ed. 397 (1956), the Supreme Court stated:

> "If indictments were to be held open to challenge on the ground that there was *inadequate* or incompetent evidence before the grand jury, the resulting delay would be great indeed. The result of such a rule would be that before trial on the merits a defendant could always insist on a kind of preliminary trial to determine the competency and adequacy of the evidence before the grand jury. This is not required by the Fifth Amendment. An indictment returned by a legally constituted and unbiased grand jury, . . . if valid on its face, is enough to call for trial of the charge on the merits. The Fifth Amendment requires nothing more."

*Id.* at 363, 76 S.Ct. at 408 (footnote omitted; emphasis added). This language was partially repeated in Lawn v. United States, 355 U.S. 339, 349–50, 78 S.Ct. 311, 2 L.Ed.2d 321 (1958), and more recently in United States v. Calandra, 414 U.S. 338, 345, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974). Since all of these cases involved the *character* of the evidence upon which a grand jury can base an indictment [15] rather than the *quantum* of evidence before the grand jury, the appellant would dismiss the use of "inadequate" by the Supreme Court in the above-quoted passage as "unfortunate dictum." We cannot accept this assessment. The Court in *Costello* expressly refused to adopt a rule permitting defendants to challenge indictments on grounds of inadequate or incompetent evidence. In the Court's view such a rule "would result in interminable delay but add nothing to the assurance of a fair trial." 350 U.S. at 364, 76 S.Ct. at 409. Both the Court's language and the policy reasons [16] underlying its decision militate against construing those portions of *Costello* which the appellant finds objectionable as mere dictum. That task is for the Supreme Court, should it ever be so inclined.

Since Woodcock's challenge of the indictment does not raise a constitutional issue, we need not consider the merits of his claim.

### III. Severance

At several points throughout the first small loans trial, Woodcock moved to sever his case from those of his codefendants. The judge denied these motions, and the Supreme Judicial Court of Massachusetts ruled that these denials were not an abuse of discretion. 1971 Mass. Adv. Sheets at 1388–91, 275 N.E.2d at 53–55. The appellant now argues that to try him in a "mass trial" involving 14 other defendants and 48 indictments, 45 of which did not even name him, constituted a denial of due process of law. He stresses in particular the large volume of evidence, most of which neither directly involved the appellant nor was admitted against him, and the necessary complexity of the trial judge's instructions to the jury outlining the limitations on the evidence. Quoting Coleridge, the appellant states that to expect the jury to absorb and categorize all this material would require "a willing suspension of disbelief."

---

**15.** The issue in *Costello* was whether an indictment can be based solely on hearsay evidence. *Lawn* concerned evidence allegedly obtained in violation of the Fifth Amendment, and *Calandra* dealt with evidence seized in violation of the Fourth Amendment.

**16.** In *Calandra* the Court also stressed the importance of orderly grand jury proceedings, uninterrupted by tangential litigation such as motions to suppress. 414 U.S. at 349–50, 94 S.Ct. 613, 38 L.Ed.2d 561. This would normally not be a problem when only the adequacy of the evidence is at issue.

As an integral part of this argument, Woodcock complains of the admission of hearsay statements of his coconspirators which, although not directly implicating him, nevertheless tended to show the existence of a conspiracy and to prove the substantive bribery offense. By and large, the appellant does not stress particular instances of prejudice,[17] but adverting to the confrontation clause of the sixth amendment and noting his inability to cross-examine his codefendants [18], he condemns the admissions in general terms as overly prejudicial.

■ The concern voiced by Woodcock is of course by no means novel. Both the United States Supreme Court [19] and this Circuit [20] have been among those who have acknowledged the danger that in reaching a verdict with respect to any individual defendant, a jury might, consciously or unconsciously, consider evidence that was admitted only against his codefendants. When the case against his codefendants is overwhelming, the relatively minor actor runs a risk of being found guilty by association. Proper rulings on the admissibility of evidence and lucid limiting in-

structions to the jury cannot entirely eliminate the danger of prejudice; they can, however, reduce it to acceptable proportions. For against the prejudice encountered by an individual defendant must be balanced the legitimate governmental interest in having a joint trial—chiefly, the avoidance of the cost and docket congestion engendered by a multiplicity of trials.[21] And it is with this balance in mind that the appellant's claim of a denial of due process must be assessed. *Cf.* Goldberg v. Kelly, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970).

■ We do not think that the complexity of the trial made it so fundamentally unfair as to deny the appellant his constitutional rights. Quite apart from any evidence of the acts and declarations of his coconspirators which may have been admitted against Woodcock, there was, as he concedes, direct testimony by Heath that at the Commodore Hotel meeting Woodcock joined the conspiracy and in fact set the maximum figure of $25,000. The jury, with the aid of the judge's instructions and the summations of the various attorneys was certainly capable of considering this evidence.

17. Woodcock does stress one instance in which he contends that being tried jointly deprived him of an important piece of evidence. On cross-examination Heath was asked what amount of money he was told by his employer, American Investment Co., that it had contributed to the Rate Board program. The purpose of this inquiry was to show that the contributions of American and two other corporate defendants (Household and Beneficial) alone totalled $25,000, and therefore that Liberty could not have participated. The Commonwealth did not object, but other defendants did on the ground that the question called for hearsay. Woodcock argues that since the Commonwealth did not object, he would have had the benefit of this testimony had he been tried alone. However, the Commonwealth's failure to object may well have been based on the fact that the testimony tended to *inculpate* other defendants as well as exculpate Woodcock. Whether the Commonwealth would have followed the same tactic in an individual trial is purely conjectural.

18. Woodcock's inability to call his codefendants to the stand is cited as one reason why the trial should have been severed. However, even if Woodcock had been tried separately,

there is no indication that his codefendants would have waived their fifth amendment privilege against self incrimination to testify on his behalf. Moreover, there is no indication that the testimony of any of his codefendants would have exculpated Woodcock. Thus, any advantage which might have been gained by severance seems more theoretical than real. *See* United States v. Leonard, 161 U.S.App.D.C. 36, 494 F.2d 955, 970 (1974), citing Gorin v. United States, 313 F.2d 641, 645–46 (1st Cir.), cert. denied, 374 U.S. 829, 83 S.Ct. 1870, 10 L.Ed.2d 1052 (1963).

19. Krulewitch v. United States, 336 U.S. 440, 445, 69 S.Ct. 716, 93 L.Ed. 790 (1949) (Jackson, J., concurring); Blumenthal v. United States, 332 U.S. 539, 559, 68 S.Ct. 248, 92 L.Ed. 154 (1947).

20. Gorin v. United States, 313 F.2d 641, 646 (1st Cir.), cert. denied, 374 U.S. 829, 83 S.Ct. 1870, 10 L.Ed.2d 1052 (1963).

21. In addition, there is the added possibility that minor actors would not be tried at all were it not for the vehicle of a joint trial. *See* United States v. Cohen, 145 F.2d 82, 95–96 (2d Cir. 1944), cert. denied, 323 U.S. 799, 65 S.Ct. 553, 89 L.Ed. 637 (1945).

And we cannot assume that the jury was so irresponsible that it did not assess the case against each defendant independently and with full consideration of the evidence which directly implicated that individual. With respect to Woodcock, therefore, the jury must have considered Heath's testimony about the October 1962 meeting. Heath's credibility and the accuracy of the statement which he attributed to Woodcock were proper jury questions, and they were evidently resolved against the appellant.

To charge that the jury would convict the appellant solely on the basis of evidence which did not directly implicate him is an indictment on the jury system itself. But "not guilty" verdicts returned by the jury with respect to some of the charges against defendants Hanley and Garfinkle belie any contention that the jury reached its decision without carefully sifting the evidence. The quantity of incriminating evidence against Woodcock was small; his name did not recur throughout the testimony, constantly interwoven with allegations against his various codefendants. Thus, it would seem to have been a relatively simple task for the jury to focus on Woodcock without becoming confused about which evidence applied to whom. Whether the jury was able to follow the limiting instructions of the judge with the precision of a computer is not the relevant inquiry. It is rather whether the appellant received a fundamentally fair trial in light of the legitimate interests of the Commonwealth in trying him jointly with his coconspirators. In this connection we see nothing in the evidence, the number of defendants, or the rulings of the trial judge which would warrant a conclusion that the sheer complexity of this trial prevented the jury from appraising the independent evidence against the appellant and meting out individual justice under the law. *See* United States v. Stromberg, 268 F.2d 256, 264 (2d Cir.), cert. denied sub nom. Lessa v. United States, 361 U.S. 863, 80 S.Ct. 119, 4 L.Ed.2d 102 (1959).

The appellant's reliance on Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), is misplaced. *Bruton* held that, notwithstanding the giving of limiting instructions, a defendant's Sixth Amendment right to confrontation was violated by the introduction of the confession of a codefendant who did not take the stand. The Supreme Court based its decision primarily on the realization that in some instances the risk that the jury will not follow limiting instructions is overwhelming. And that was so in the context of *Bruton* where the statements of the codefendant were not only "powerfully incriminating" but also inherently unreliable. 391 U.S. at 135–36, 88 S.Ct. 1620, 20 L.Ed.2d 476. However, as this court has already noted, United States v. Clayton, 450 F.2d 16 (1st Cir. 1971), cert. denied, 405 U.S. 975, 92 S.Ct. 1200, 31 L.Ed.2d 250 (1972), *Bruton* expressly did not deal with a situation where statements were admissible under a recognized exception to the hearsay rule. 391 U.S. at 128 n. 3, 88 S.Ct. 1620, 20 L.Ed.2d 476; *see* Dutton v. Evans, 400 U.S. 74, 91 S.Ct. 210, 27 L.Ed.2d 213 (1970). And in any event, the situation here is in no way analogous to *Bruton*, since the appellant nowhere complains of a statement so incriminating that it would be a totally unrealistic test of the jury system to expect the jury to ignore it.

### IV. The Mode of Prosecution

Woodcock argues that the manner in which he was prosecuted violated the equal protection clause of the fourteenth amendment. In essence, he complains that too many guns were brought to bear on him and his coconspirators. In particular, he objects to the extensive role played by agents of the Massachusetts Crime Commission, a special commission created by the legislature in 1962 "to investigate and study as a basis for legislative action the existence and extent of organized crime within the Commonwealth and corrupt practices in government at state and local levels. . . ." Resolves 1962, c. 146.

We need not tarry long on this question. Both the trial court and the Supreme Judicial Court of Massachusetts

found that the participation of the Commission neither offended any provisions of state law nor violated the federal constitution. Of course, in this habeas corpus action, only the latter question is of concern to this court, and we feel that no valid constitutional claim is presented. A state can, and indeed must, proceed against large and complex criminal schemes more forcefully than against small criminals. As long as there is a rational purpose behind the state's decision on the manner of prosecution, no constitutional infirmity exists. *Cf.* Johnson v. Louisiana, 406 U.S. 356, 363–65, 92 S.Ct. 1620, 32 L.Ed.2d 152 (1972). That such a rational purpose was present in this case is plain. Corruption in government strikes at the heart of the democratic process and is among the most invidious of all crimes. For the legislature of Massachusetts to conclude that special measures were necessary to attack it is eminently justifiable. Moreover, the complexity of the proceedings in the "small loans cases" is witness to the extensive nature of the criminality, and therefore, the necessity of utilizing a considerable amount of resources to uproot it is quite understandable.

## V. Alleged Application of an Ex Post Facto Law

As his final contention, Woodcock asserts that with respect to his conviction for bribery, he has been the victim of the application of an ex post facto law.[22] The statute about which he complains, as amended in 1968, provided:

"Whoever aids in the commission of a felony, or is an accessory thereto before the fact by counselling, hiring, or otherwise procuring such felony to be committed shall be *indicted, tried* and punished as a principal."

**22.** The Supreme Court has defined an *ex post facto* law as

one which imposes a punishment for an act which was not punishable at the time it was committed; or an additional punishment to that then prescribed; or changes the rules of evidence by which less or different testimony is sufficient to convict than was then required; or, in short, in relation to the offense or its consequences, alters a situation of a party to his disadvantage.

Ann. Laws of Mass., C. 274 § 2 (emphasis added). Before 1968,[23] that is, at the time of the offense and the trial, the same statute read:

"Whoever aids in the commission of a felony, or is an accessory thereto before the fact . . . shall be punished in the manner provided for the punishment of the principal felon."

Thus, the significant language added in 1968 was "indicted, tried." The apparent aim of the amendment was to cure an artificial variance problem which permitted an accused to avoid conviction altogether when an indictment named him as a principal but the evidence showed him to be only an accessory before the fact. *See* Commonwealth v. Benjamin, 358 Mass. 672, 266 N.E.2d 662, 668 (1971).

In brief, the evidence pertaining to the bribery was that Woodcock and the other defendants acted through an agent by delegating to Nathaniel Barber, one of the coconspirators, the authority to offer the bribe to Hanley. *See* 1971 Mass. Adv. Sheets at 1405–07, 1487, 275 N.E.2d at 64, 110. Woodcock argues that prior to the 1968 amendment to C. 274 § 2, this evidence made him at most an accessory before the fact. In affirming his conviction as a principal, therefore, he contends that in conceptual terms (though not expressly), the Supreme Judicial Court of Massachusetts applied the 1968 amendment to his case.[24]

The fundamental difficulty with this argument is that it has apparently long been the Massachusetts rule in bribery cases that one who effects a bribe through an agent can be convicted as a principal. *See* Commonwealth v. Mannos, 311 Mass. 94, 108, 40 N.E.2d 291, 299 (1942); Commonwealth v. Connolly, 308 Mass. 481, 489–90, 33 N.E.2d 303, 308–09

Duncan v. Missouri, 152 U.S. 377, 382, 14 S.Ct. 570, 572, 38 L.Ed. 485 (1894); *see* Calder v. Bull, 3 U.S. (3 Dall.) 386, 390, 1 L.Ed. 648 (1798).

**23.** A subsequent amendment in 1973 returned the statute back to its pre-1968 wording.

**24.** The appellant concedes that in misdemeanor cases acting through agents is sufficient to sustain conviction as a principal. Dolan v. Commonwealth, 304 Mass. 325, 23 N.E.2d 904 (1939).

(1941).[25] Thus, the Supreme Judicial Court of Massachusetts in no way applied a new principle of law to the appellant's case, and we have no occasion to consider whether it would have constituted an *ex post facto* law if the Court had done so.[26] In truth, it appears that Woodcock's objection is not one of constitutional dimension but rather relates to the sufficiency of the evidence to convict him of bribery, an issue which the state courts have answered adversely to him.

## VI. Conclusion

Having considered all the points raised by the appellant we find no basis for disturbing the holding of the court below. Accordingly, the decision of the district court is:

Affirmed.

**25.** Although *Mannos* and *Connolly* involved requesting or accepting bribes, we see no basis for concluding that the rule should be any different when the crime involves offering or giving a bribe.

**26.** We note in passing that the Supreme Judicial Court of Massachusetts has ruled that application of C. 274 § 2, as amended in 1968, to acts committed prior to that time does not constitute an *ex post facto* law. Commonwealth v. Benjamin, 358 Mass. 672, 266 N.E.2d 662 (1971).